ROBERT M. ERNSTOFF, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ernstoff v. Commissioner
Docket Nos. 6429-81, 31720-85, 1633-86.
United States Tax Court
T.C. Memo 1988-146; 1988 Tax Ct. Memo LEXIS 174; 55 T.C.M. (CCH) 545; T.C.M. (RIA) 88146; April 11, 1988. Robert M. Ernstoff, pro se. Jill A. Frisch and Howard J. Berman, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: By statutory notices of deficiency, respondent determined deficiencies in petitioner's Federal income tax as follows: Year
Amount
1976
$ 36,163
1977
19,382
1978
12,692
1979
8,570
1980
116
In the notices of deficiency encompassing the tax years 1977 through 1980, respondent also determined that the entire deficiencies for those years were attributable to tax-motivated transactions so that, pursuant to section 6621(c), [1] increased interest is required. *178 By amendment to his answer in docket number 1633-86, respondent asserted an increase in the deficiency for 1980 in the amount of $ 4,426. By a second amendment to his answer in docket number 1633-86, respondent asserted that the amount of the increased deficiency for 1980 also is subject to increased interest pursuant to section 6621(c). By amendment to his answer in docket number 6429-81, respondent asserted that the portion of the deficiency for 1976 that is at issue herein is subject to increased interest pursuant to section 6621(c). After concessions, the issues for our decision are (1) whether petitioner is entitled to deductions and investment tax credits from his distributive share of D & D Associates, a Connecticut limited partnership, for the years in issue; (2) whether petitioner is entitled to deductions and investment tax credits from his distributive share of Chicago Properties, a New York limited se partnerhsip, for the years at issue; and (3) whether the transactions with regard to those partnerships were tax motivated so that increased interest is required pursuant to section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. *179 The stipulation of facts, supplemental stipulations of facts, and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in New York when he filed his petitions. Petitioner is a certified public accountant. From 1969 through 1972, he was a member of the Tax Department of Arthur Young & Co., an international accounting firm. From August 1972 through September 1973, petitioner was the Director of Syndicate Investments for real estate, oil, and gas for Cowan & Co., a member of the New York Stock Exchange. For convenience, our remaining findings of fact and opinion will be grouped according to the partnership to which they relate. D & D ASSOCIATES FINDINGS OF FACTS
A. Formation
D & D Associates ("D & D") is a Connecticut limited partnership organized in 1976 to construct and exploit community antenna television ("CATV") systems in Dania, Florida, and Davie, Florida. The initial capital of D & D was $ 703,500. Petitioner was a limited partner in D & D; his capital contribution in the amount of $ 17,500 [2] gave him a 2.475 percent share in the partnership. *180 A Confidential Memorandum ("Memorandum"), dated July 20, 1976, was prepared in connection with the offering of partnership interests in D & D. The Memorandum stated that upon completion of the offering, D & D would enter into several agreements with Cable Holdinggs, Inc., a New York corporation ("Cable Holdings"), and Davie Video Corporation ("DVC") relating to the construction and operation of CATV systems in Dania and Davie. During the years at issue, Cable Holdings and DVC were related corporations, Richard Treibick was the controlling shareholder of Cable Holdings, and Mr. Treibick, Robert Bronz, and Benjamin Ginsberg were officers of Cable Holdings. During the years at issue, Mr. Treibick also was the sole shareholder of Cable Management Company, Inc., and he and Messrs. Broz and Ginsberg were officers and directors of Cable Management Company, Inc. Cable Management Company, Inc. and Mr. Broz owned all the stock of DVC, a management company having the same officers and directors as Cable Management Company, Inc. (Hereinafter we sometimes shall refer collectively to Cable Holdings, DVC, and other corporations owned or controlled by Mr. Treibick as Mr. Treibick's corporations. *181 ) During the years at issue, Norman Stein was the sole general partner of D & D. Since 1972, Mr. Stein has been Vice President and General Manager of Technicolor, Inc., a corporation located in New York City that processes and manufactures copies of motion pictures. Prior to his association with D & D, Stein had had no experience in any phase of the CATV industry. The Memorandum provided that Mr. Stein would receive a management fee of $ 96,000 as compensation for his services rendered in connection with D & D for 1976 and that he would pay all legal fees and sales expenses for D & D out of that fee. Mr. Stein also was required to make a $ 3,500 contribution to capital, for which he would receive an interest in the partnership of 1 percent. Mr. Stein's partnership interest would increase to 5 percent once the limited partners recouped their total contributions. The Memorandum warned that Mr. Stein would devote only a limited amount of time to D & D, that he might become a general partner in other ventures, and that he might become involved with other CATV systems as well. The Memorandum and Amended Limited Partnership Agreement provided that limited partnership units were *182 sold only to persons who met certain minimum standards of income and net worth, [3] who were in a position to benefit from the applicable tax laws with respect to such investments, who had knowledge or prior investment experience or had consulted a professional advisor, who understood the speculative nature of the investment, and who were able to bear the economic risk of the investment. The Memorandum provided that D & D would pay Cable Holdings $ 1,400,000 for the construction of the systems, of which $ 200,000 would be in cash and $ 1,200,000 would be evidenced by a non-recourse note secured by all of D & D's property. The Memorandum further provided: The Equipment to be acquired by [D & D] consists principally of three elements: a reception facility, a head end and a signal distribution system. The reception facility includes a tower, antennae, and other receiving equipment located at a site where *183 the desired television and FM signals are considered strong and reliable. The head end is located at the base of the antenna tower and houses electronic equipment which amplifies, refines, modifies and modulates the signals, preparing them for passage over the System's network of coaxial cables. The signal distribution system consists of amplifiers and trunk lines which originate at the head end and carry the signals to various portions of the System, smaller distribution cables and distribution amplifiers which carry the signals to the immediate vicinity of the subscriber and drop wires which carry the signals into the premises of the individual subscriber. On July 20, 1976, D & D and Cable Holdings entered into a Construction and Purchase Agreement whereby Cable Holdings agreed to construct and install CATV systems in the Dania and Davie localities. Cable Holdings only agreed to construct cable distribution plants; the agreement did not provide for the construction of other necessary capital components, such as a reception facility, a headend, drops (installations to individual subscribers), or converters (devices attached to television sets to permit the reception and selection *184 of cable television channels). Under the agreement, D & D would pay a fixed price of $ 1,400,000 for the systems. The agreement provided that Cable Holdings was solely responsible for any costs of the construction in excess of $ 1,400,000, and that Cable Holdings would have no right of reimbursement from D & D for any excess costs. As provided in the Construction and Purchase Agreement, D & D paid the purchase price by transferring $ 200,000 cash to Cable Holdings as down payment and by executing a negotiable non-recourse promissory note in the principal amount of $ 1,200,000 (the "Cable Holdings note"). The Cable Holdings note was dated August 10, 1976, and provided that Cable Holdings had no recourse against any of D & D's general or limited partners. The note also provided that all unpaid principal on the note would be due on January 1, 1985, and that interest on the unpaid principal was due at the rate of 15 percent per annum through April 30, 1977, and 6 percent per annum thereafter until maturity. Attached to the note was a payment schedule which provided that D & D was to make payments on December 31 of each year as follows: Interest
Principal
Approx.
Year
Payment
Payment
Balance
1976
$  70,520
-0-  $ 1,200,000
1977
108,000
$   2,000
1,198,000
1978
71,880
38,120
1,159,880
1979
69,592
40,408
1,119,472
1980
67,168
42,832
1,076,640
1981
64,598
45,402
1,031,238
1982
61,874
48,120
983,112
1983
-0-  -0-  1,042,098
1984
-0-  -0-  [4] 1,107,624
1985 *
124,512
983,112
-0-   *185 On July 20, 1976, the parties also entered into a Security Agreement which provided that all indebtedness of D & D to Cable Holdings was secured by all of the tangible and intangible assets utilized in connection with the CATV systems serving Dania and Davie, Florida. On July 20, 1976, D & D and Cable Holdings entered into three additional agreements -- an Equipment Warranty, a Non-Competition Agreement, and a Franchise Sale Agreement. Pursuant to the Equipment Warranty, D & D paid $ 140,000 to Cable Holdings, and Cable Holdings promised to repair or replace any part of the CATV systems constructed by it for D & D for a period of two years from the completion of the systems. The warranty from Cable Holdings protected D & D against equipment and construction defects, technological *186 obsolescence, and casualty loss for the two year period beginning with the completion of the CATV systems. The warranty had minimum value because the systems were new and therefore unlikely to become obsolete during the two-year warranty period. [5]
Under the Non-Competition Agreement, Cable Holdings agreed that, for the two year period commencing on January 1, 1977, it would not compete in any way with the CATV systems in Dania and Davie. D & D paid Cable Holdings $ 20,000 in consideration for the agreement not to compete. The Non-Competition Agreement was unusual and unnecessary in that an affiliate (DVC) of the party agreeing not to compete (Cable Holdings) entered into a Joint Venture to manage the systems and share in the systems' profits. (The Joint Venture is discussed below.) It is highly unlikely that Cable Holdings would have competed against the D & D/DVC venture in Dania and Davie because such *187 competition would have adversely affected the interest of Cable Holdings' affiliate, DVC. Furthermore, the cable television industry is a natural monopoly in that operators of CATV systems are required by the local governments to provide services throughout the community. Thus, the entire community must be wired for cable television, not just the areas of the community most profitable for a CATV system operator. Any competitor of D & D for the Dania and Davie areas therefore would be required to construct substantial CATV equipment, as well as receive permission from the local governments, before it could begin to compete with D & D in the Davie and Dania areas. A two-year non-competition agreement would be of only nominal benefit to D & D because a competitor would require a substantial part of the two-year period before it could install the necessary equipment and obtain the necessary governmental authorization to provide service in the Dania and Davie areas. The Franchise Sale Agreement provided that D & D would pay Cable Holdings $ 25,000 in exchange for the franchise rights for Dania and Davie. Cable Holdings therein warranted that it or its wholly owned subsidiary owned *188 the CATV franchises for Dania and Davie. Cable Holdings also warranted that those two franchises were freely alienable and were free of any and all liens and encumberances. The original franchises had been granted in 1973 by the Town of Davie and the City of Dania to FloridaGold Coast Cable TV, Inc. ("FloridaGold Coast"), a wholly owned subsidiary of Cable Holdings. FloridaGold Coast was not mentioned by name in the Franchise Sales Agreement. On July 20, 1976, D & D, DVC, and Realtec Planners, Inc. ("Realtec") entered into a Joint Venture which was to run for a ten year period commencing on January 1, 1977. During the years at issue herein, petitioner was employed by Realtec, and he and Anthony Desimone were President and Vice President, respectively, of Realtec. The Joint Venture agreement provided that DVC would manage the Dania and Davie CATV systems and that DVC would receive a guaranteed payment of $ 125,000 for start-up costs. The agreement also provided that, after the initial commencement of operations of each system and until December 31, 1976, DVC would retain any revenue earned by the systems and would bear any deficit from the systems' operation. The agreement *189 further provided that D & D was required to pay all expenses, including debt service, for the operation of the systems, but that DVC was obligated to loan the Joint Venture sufficient funds to cover any operational deficits, including debt service, for the two year period beginning January 1, 1977. A clause in the agreement provided, however, that "nothing contained herein shall be construed to give the Joint Venture any right either legal or equitable to the assets of D & D." The Joint Venture agreement provided that revenues resulting from the operation of the systems after December 31, 1976, would be allocated, on an annualized basis, as follows: 1. To operating expenses. 2. $ .34 per subscriber per month to [DVC]. 3. To debt service. 4. To [DVC] in the amount of loan made by it to make up any operational deficiency as provided above. 5. Beginning in the year 1979, to D & D, on a non-cumulative basis except as noted below, an annual priority cash payment (the "Partnership Priority Payment") of up to $ 51,000. Beginning in the year 1980, to the extent that each such payment does not equal $ 51,000 on an annualized basis and has not otherwise been paid it *190 will be added to the amount to be received by D & D on the sale or refinancing of D & D's property as described below. 6. Also commencing in the year 1979, to [DVC] on a non-cumulative basis except as noted below up to $ 51,000 (the "[DVC] payment"). To the extent that each such payment does not equal the comparable payment to D & D, it will be paid from available cash flow in subsequent years after payment of items 1 through 5 above. 7. Prior to the repayment of the note dated as of the date hereof in the principal amount of $ 1,200,000 payable to Cable Holdings, Inc. (the "Note"), D & D will receive any additional cash flow. After the Note has been paid in full, any additional cash flow will be divided equally between D & D and [DVC]. In addition, the agreement provided for the sale or refinancing of the systems as follows: In the event that the Systems are sold by D & D or refinanced then the proceeds of such sale or refinancing (to the extent available) shall be allocated as follows: 1. An amount to D & D necessary to pay any accrued interest and to reduce the principal balance of the Note or any extensions thereof due Cable Holdings, Inc. or any affiliated *191 entities thereof (which amount D & D shall use for such purposes) as follows: Year in which transaction
Balance remaining
occurs
after reduction *
1976
$ 700,000
1977
700,000
1978
700,000
1979
830,000
1980
910,000
1981 and thereafter
980,000
2. To [DVC] in the amount of any unpaid loan made by [DVD] to make up any operational deficiency as provided above. 3. Until the repayment of the balance of the Note, D & D shall receive an amount equal to the balance of the Note, which amount D & D shall use to repay the Note. 4. After the repayment of the balance of the Note and assuming [DVC] is still a participant in the venture, 50% to D & D and 50% to MCI. Anything to the contrary notwithstanding, to the extent that the distribution to D & D after the payment of the Note is less than $ 700,000 plus the amount of any Partnership Priority Payments unpaid as of the date of the sale or refinancing and required to be paid as set forth above less the amount of any funds received by D & D exclusive of the Partnership Priority Payments and not used to repay the *192 Note or to pay Realtec, [6] Realtec and [DVC] will remit such difference to D & D out of their respective distributions pursuant to Paragraph 4 above on a Pro Rata basis. This sale provision in effect guaranteed D & D a minimum distribution of the first $ 700,000 of any proceeds remaining after the discharge of the Cable Holdings note. [7]
The Joint Venture agreement stated that Realtec had been retained by D & D as a consultant and that D & D was aware that Realtec had "acted as a finder" for Cable Holdings. Realtec *193 received a finder's fee of $ 86,000 in connection with the transactions between Cable Holdings and D & D. The $ 86,000 fee to Realtec was paid by DVC out of its $ 125,000 guaranteed payment from D & D. On January 31, 1977, D & D and DVC entered into three agreements whereby D & D sold to DVC the CATV franchises granted by the localities of Davie and Dania. In consideration for the franchises, DVC (1) in effect agreed to forgive D & D of all indebtedness up to $ 125,000 for funds advanced by DVC to cover operating deficits, (2) extended to January 1, 1981, the period for which it was required to advance funds to cover operating deficits for the systems, and (3) granted D & D all operating rights with respect to the franchises that D & D just had transferred to DVC. The Memorandum stated that the franchises granted by the municipalities "are non-exclusive and cannot be transferred without the permission of the granting body." Neither of the ordinances from the municipalities specifies whether the franchises are nontransferrable without the permission of the municipality; however, the ordinance from Dania does state that the "grantee has been affirmatively advised of the charter *194 requirements of the City of Dania regarding the creating of franchises and shall accept the within ordinance subject to all terms and conditions of the city charter * * *." Nothing in the record gives us an indication as to what the Dania charter requirements were in regard to franchises. Also, no evidence has been presented to indicate that either governmental body ever gave permission for the transfer of the franchises either to D & D or from D & D to DVC. Mr. Treibick's corporations would not have entered into any of the aforementioned agreements if D & D had not agreed to enter into all of the agreements. On November 10, 1977, Burnup and Sims Cable Com, Inc. ("Burnup & Sims") entered into a contract with Cable Holding Company, a Delaware corporation, [8] whereby Burnup & Sims agreed to install approximately 18 miles [9] of cable system in the Dania-Davie, Florida area. The contract provided that the system to be installed by Burnup & Sims would consist entirely of the underground routing of coaxial cable. The contract also provided that the start of construction shall be on or about December 5, 1977. *195 B. Operation of the Systems
According to the Memorandum, D & D's initial capital was to be used as follows: Amount
Purpose
$ 200,000
Construction and Equipment (down
payment to Cable Holdings)
140,000
Warranty payment
25,000
Franchise purchases
20,000
Non-Competition Agreement
76,000
Prepaid Interest on Cable Holdings
note.
125,000
Start Up Costs to Joint Venture
(from which Realtec's $ 86,000 fee
was paid)
96,000
Payment to general partner for his
services. From this amount,
Mr. Stein was responsible
for the payment of legal fees of
approximately $ 12,500 and certain
sales expenses of approximately
$ 70,000.
21,500
Working capital
$ 703,500
For Federal tax purposes, D & D had a year-end of December 31, and reported its income on the accrual method of accounting. No books or records of D & D were presented as evidence; however, D & D reported operating income and expenses on its partnership income tax returns filed for 1976-1980 as follows: Income
1976
1977
1978
1979
1980
Gross Profit
$ 10,452
$ 21,826
$ 69,013
$ 237,414
$ 26,131
Interest
121
3,664
17,613
-0-
20,853
Total Income
$ 10,573
$ 25,490
$ 86,626
$ 237,414
$ 46,984
*196 Expenses
Interest
$   72,413 $  123,433 $    6,347 $    - 0 - $   - 0 - Depreciation
175,000 306,250 231,220 176,484 - 0 - Management Fee
13,500 - 0 - - 0 - - 0 - - 0 - Administrative
46,500 - 0 - - 0 - - 0 - - 0 - Expenses
125,120 5,600 7,152 - 0 - - 0 - Advisory Fee
36,000 - 0 - - 0 - - 0 - - 0 - Warranty
- 0 - 70,000 70,000 - 0 - - 0 - Non-Compete
- 0 - 10,000 10,000 - 0 - - 0 - Insurance
- 0 - 3,100 4,560 1,244 2,921 Pole Rentals
- 0 - 12,304 7,600 6,737 920 Utilities
- 0 - - 0 - 959 4,756 219 Converter Costs
- 0 - - 0 - 29,220 61,632 2,682 Pay TV Costs
- 0 - - 0 - 9,716 45,536 4,823 Signal Costs
- 0 - - 0 - 27,550 42,325 10,946 Installation
- 0 - - 0 - 9,899 24,832 3,567 Office Expense
- 0 - - 0 - 5,040 5,751 1,812 Others [10]
- 0 - 3,209 13,938 26,174 37,803 Total Expenses
$  468,263 $  533,896 $  433,201 $  395,471 $  65,693 Net Income
(Loss)
$ (457,690)
$ (508,406)
$ (346,575)
$ (158,057)
$ (18,709)
*197 D & D's income tax returns never reflected the agreements of January 31, 1977, in which D & D sold to DVC the franchises for Davie and Dania. On his individual income tax returns, petitioner reported his 2.475 percent share of losses and investment tax credit ("ITC") from D & D as follows: 1976
1977
1978
1979
1980
Net Loss
$ 11,328
$ 12,583
$ 8,577
$ 3,912
$ 463
ITC
3,465
The losses were reported by petitioner for the five years at issue total $ 3,863. No payment of principal ever was made on the Cable Holdings note. No interest payment was made on that note, except for a prepayment of approximately $ 76,000 paid in 1976 out of the original capital contributions from the D & D partners. No certificate of completion for the Dania and Davie systems ever was issued to D & D. On May 31, 1979, however, D & D sent to Cable Holdings a letter in which D & D confirmed that it accepted the equipment and franchise rights delivered pursuant to the agreements dated *198 as of July 20, 1976, and that Cable Holdings had no further obligations whatsoever to D & D under those agreements. All subcribers (customers) to the Dania and Davie systems needed converters for good reception due to the existence of off-air interference, according to a letter signed by Mr. Treibick and sent to D & D by Lakes Operating Company, Inc. ("Lakes"). During the years at issue, Mr. Treibick controlled Lakes, and Messrs. Treibick, Broz, and Ginsberg were officers of Lakes. The letter from Lakes also stated that the Dania and Davie systems were "substantially constructed in 1976 and 1977." The letter in substance was an offer to purchase the Dania and Davie systems from D & D and is discussed below. The CATV systems built for D & D were not complete, self-contained systems, but rather were only trunk lines which carried signals from the headend receiving facilities to the subscribers in Dania and Davie. In order to receive programming signals, D & D, as of January 1, 1978, leased access to a headend from Cable Holdings, Inc. of Florida, a wholly owned subsidiary of Cable Holdings. D & D's trunk lines (to carry the signals from the headend to the subscribers) were *199 cables and wires attached primarily to utility poles. [11] Pursuant to license agreements effective September 9, 1977, the trunk lines for Dania and Davie were attached to poles owned by Florida Power & Light Company ("Florida P&L"). The license agreements were between Florida P&L and FloridaGold Coast, the Cable Holdings subsidiary to which the original CATV franchises for Dania and Davie had been granted by the localities. D & D at no time rented pole space in its own name from Florida P&L. Cable Holdings, not D & D, made the payments to Florida P&L for pole rents. We find that the Dania and Davie systems were not significantly in operation until some time during 1978. Our finding is based on the following: (1) converters were required for the operation of the systems; (2) converter costs, as well as other necessary costs of operation such as pay TV costs, signal costs, installation, and office expense (presumably necessary for billing customers), were first reported as expenses *200 on D & D's tax returns by the accrual basis partnership only on the 1978 return; (3) the Burnup & Sims contract provided that construction of cable system in the Dania-Davie area would start in December 1977, thus implying that at least that portion of the Dania and Davie systems could not have been operational until 1978; and (4) D & D had no access to a headend, a necessary component for operating any CATV system, until its lease with Cable Holdings Inc. of Florida went into effect on January 1, 1978.
C. Disposition of the Systems
In a letter dated September 27, 1979, Lakes offered to purchase the Dania and Davie CATV systems from D & D for a total consideration of approximately $ 2,200,000. The consideration offered by Lakes was a payment to D & D of approximately $ 700,000 in cash and the assumption by Lakes of approximately $ 1,400,000, plus accrued interest, of existing D & D debt. On January 9, 1980, D & D and Davie Cable TV, Inc. ("Davie Cable") executed two agreements whereby Davie Cable purchased from D & D (1) all of the tangible assets used in connection with the CATV systems in Davie and Dania, and (2) D & D's operating rights under the franchises for Davie *201 and Dania. The consideration given by Davie Cable was essentially the same as was offered by Lakes in its purchase offer, specifically, $ 703,500 in cash and the assumption of debts owed by D & D in the amount of $ 1,573,368. The debts that Davie Cable assumed consisted of the original principal of $ 1,200,000 due on the Cable Holdings note, accrued interest on that note in the amount of $ 252,000 (for the three year period 1977 through 1979), and an unspecified obligation due to Lakes in the amount of $ 61,368. At the time it purchased D & D's assets, Davie Cable was a wholly owned subsidiary of Cable Holdings. On its 1980 partnership income tax return, D & D reported a long term capital gain from "various assets sold" in the amount of $ 1,442,271. D & D reported that those assets were acquired on July 1, 1976, were sold on January 1, 1980, were sold at a gross sales price of $ 1,467,271, and had a cost basis of $ 25,000, the same amount originally paid by D & D to acquire the franchise rights to Davie and Dania. D & D's 1980 tax return also reported gain under section 1231 in the amount of $ 57,254 [12] from the disposition of "Cable TV Equipment." D & D also reported recapture *202 of investment credit on its 1980 tax return. [12]
As a result of the sale of D & D's interests in the Dania and Davie systems, petitioner reported, as his distributive share from D & D, the following items on his 1980 tax return: long term capital gain -- $ 35,696; gain from disposition of property pursuant to section 1245 -- $ 1,417; and recapture of investment credit -- $ 2,388. In sum, petitioner reported total gains from D & D in the amount of $ 37,113 and total losses of $ 36,863 for the years at issue. The various gains and losses that petitioner reported from D & D aggregate to a net gain of $ 250. On January 9, 1980, the same day that it purchased the Dania and Davie systems from D&D, Davie Cable transferred to Lakes all of its rights and interests in its assets used in connection with CATV systems serving areas of Broward County, Florida. The assets transferred to Lakes included the Dania and Davie systems. On February 5, 1980, Davie Cable transferred to DVC all of its rights in the franchise granted by the Town [13] of Davie. On that same date Dania Cable TV, Inc. [14] transferred *203 to DVC all of its rights in the franchise granted by the City of Dania. On that same date DVC then transferred to Lakes all of its rights in those franchises. [15]
On February 7, 1980, Cable Holdings and Lakes sold to Buford Television, Inc. ("Buford") all their rights and assets used in the operation of various CATV systems located in Florida, including the Dania and Davie systems. Buford, a Texas corporation unrelated to D&D or Mr. Treibick's corporations, purchased *204 the rights and assets pursuant to terms of an Asset Purchase Agreement executed by Cable Holdings, Lakes, and Buford as of November 27, 1979. Among the assets and rights transferred to Buford were the pole rental contracts with Florida P&L for the Davie and Dania systems and the CATV franchise rights granted by the localities of Davie and Dania. Buford paid $ 8,326,091.33 for the assets and rights in those CATV systems purchased from Lakes and Cable Holdings. The Asset Purchase Agreement provided the following information in regard to the systems to be purchased by Buford: Subscribers as of
Homes Within Franchise
System
10/19/79
Area
Lauderdale Lakes
1,372
14,000
Dania and Davie
1,679
13,000
Broward County and
Cooper City
925
25,000
3,976
52,000
Thus, 42 percent of the subscribers in the systems sold to Buford were in Dania and Davie. 42 percent of the total price paid by Buford is approximately $ 3.5 million. 25 percent of the total residential units within the franchise areas of the systems were within Davie and Dania. [16] 25 percent of the sales price is approximately $ 2.08 million. *205 OPINION We must determine whether petitioner properly claimed as deductions his distributive share of the losses claimed by D&D, whether petitioner is entitled to his claimed distributive share of ITC for 1976, and whether the transactions at hand were tax motivated such that the increased rate of interest under section 6621(c) is required. The determination of these issues depends upon whether D&D is entitled to claimed deductions for depreciation, interest expense, noncompetition fees, management fees, warranty fees, administrative expenses, and other fees and expenses, and whether D&D is entitled to a claimed ITC with respect to the CATV equipment. All issues relating to D&D were raised by respondent in the statutory notices of deficiency, except for the section 6621(c) increased interest for the 1976 tax year. In that petitioner bears the burden of proof on issues that were raised in the statutory notices, he has the burden of proof with respect to D&D, except for the increased interest for 1976 for which respondent has the burden of proof. Rule 142(a). Respondent advances numerous arguments to support the disallowance of the claimed losses and ITC from D&D. One ground *206 of attack by respondent is that D&D did not acquire sufficient attributes of ownership to be considered the owner of the Dania and Davie systems for Federal tax purposes. Respondent asserts that the transactions between Mr. Treibick's corporations and D&D in effect were a vehicle to provide an off-balance sheet loan to Mr. Treibick's corporations to finance construction of the Dania and Davie systems. Respondent contends that payment for such a loan, instead of being in the form of interest, was in the form of tax benefits for D&D's partners and finder's fees paid to Realtec. We agree that D&D never possessed sufficient benefits and burdens of ownership of the CATV systems; consequently, we need not address all of respondent's other contentions. The Supreme Court has held that where there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.
Frank Lyon Co. v. United States,435 U.S. 561, 583-584 (1978). *207 The simple expedient of drawing up written agreements, however, does not control for tax purposes where the economic realities are to the contrary. Frank Lyon Co. v. United States, supra at 573. Taxation is not so much concerned with refinements of title as it is with a taxpayer's actual command over the property. Frank Lyon Co. v. United States, supra at 572; Corliss v. Bowers,281 U.S. 376, 378 (1930); Tolwinsky v. Commissioner,86 T.C. 1009, 1041 (1986). In the context of a purported sale transaction, such as that at issue herein, the issue is whether the parties have done in fact what the form of their written agreements purports to do. Falsetti v. Commissioner,85 T.C. 332, 348 (1985). More specifically, we must determine whether D&D ever purchased the Dania and Davie CATV systems from Mr. Treibick's corporations. The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or for a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). *208 The key to deciding whether a particular transaction is a sale is to determine whether the benefits and burdens of ownership have passed to the putative purchaser. Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). Falsetti (85 T.C. at 348) and Grodt & McKay Realty, Inc. (77 T.C. at 1236-1237) noted eight factors to consider in determining whether a sale occurs: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property: (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) *209 which party receives the profits from the operation and sale of the property. [Citations omitted.] Those cases also mentioned a ninth factor -- "the presence or absence of arm's-length dealing", i.e., whether the purchase price approximates the fair market value of the property. Falsetti v. Commissioner,85 T.C. at 348, 351; Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. at 1240-1241. See also Estate of Franklin v. Commissioner,544 F.2d 1045, 1048 (9th Cir. 1976), affg. on different grounds 64 T.C. 752 (1975). The record is clear that, as between D&D and Mr. Treibick's corporations, D&D held the nominal title to the cable distribution plant used in the Davie and Dania systems. It is not so clear, however, whether third parties would recognize D&D, rather than one of Mr. Treibick's corporations, as the titular legal owner of the CATV systems. It appears that the local governments in Dania and Davie considered Mr. Treibick's corporations, not D&D, to be the owner of the systems. With the possible exception of the "start-up period" of July 1976 through January 1977, one of Mr. Treibick's corporations owned *210 the franchises for Davie and Dania at all times from the days the local governments granted the franchises until the day one of Mr. Treibick's corporations sold them to Buford in 1980. Even during the start-up period, when D&D putatively was the nominal owner of the franchise rights, the evidence indicates that the localities continued to view FloridaGold Coast as the owner of the franchises. The original 1973 ordinance from the City of Dania granting the Dania franchise to FloridaGold Coast, as well as a 1983 city ordinance which extended the franchise right for an additional ten year period, referred to the franchise right as having been granted to FloridaGold Coast and "its successors and assigns." [17] Curiously enough, however, a resolution passed by the Dania city commission on September 14, 1976, refers only to Florida God Coast, not to any successors or assigns, in approving the rates to be charged by FloridaGold Coast to subscribers within the Dania city limits. Although the omission of the phrase "successors and assigns" in the 1976 resolution may be a simple oversight, we note that the phrase is omitted in only the 1976 resolution. We also note that the 1976 resolution *211 is the only communication in evidence to or from either locality during the start-up period. The omission of the phrase "successors and assigns" in the 1976 resolution and the inclusion of that phrase in the two other resolutions cause us to infer that the City of Dania was unaware that FloridaGold Coast had transferred or assigned the franchise as of September, 1976 (when D&D putatively was the owner), but that the City was aware that the franchise had changed hands by 1983 (after Buford became the owner). For that matter, we have seen no evidence to indicate that either municipality ever was aware that D&D ever held any interest in the CATV systems or the franchises. The absence of any such evidence is particularly damaging to petitioner's position when we consider the statement in the Memorandum that the franchises cannot be transferred without the permission of the municipalities. If we assume arguendo that the statement by D&D in the Memorandum was correct, petitioner's failure to introduce evidence that either municipality gave permission *212 for the transfer of the franchise to D&D gives rise to a presumption that no such evidence exists and that the franchises never were effectively transferred to D&D. [18] See McLaughlin v. Pacific Lumber Company,293 U.S. 351, 356 (1934); Witchita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Even if D&D's statement in the Memorandum was incorrect, our conclusion as to whom the municipalities viewed as owning the systems would not change. If the Memorandum was incorrect and the franchises could be transferred without permission from the granting body, we would not expect there to be an ordinance granting such permission. [19] Nonetheless, we have seen no evidence that either municipality ever knew of D&D's involvement with the systems. We think *213 that any reasonable businessman owning an asset such as the CATV systems would have been in contact with the municipalities at some time. A CATV system may not operate without the franchise right granted by the municipality, so the franchise right arguably is the most important asset of a CATV system. A reasonable owner of a CATV system most certainly would wish to cultivate and maintain the good graces of the local government, which unilaterally could render the systems far less valuable either by revoking the franchise or by granting an additional franchise for the area of operations to a competitor. The total lack of communication between D&D and the municipalities indicates that D&D did not act as the true owner of the systems insofar as the municipalities were concerned and that the municipalities did not recognize D&D as the owner of the systems. *214 We note two other indications that third parties might have viewed Mr. Treibick's corporations, not D&D, as the owner of the systems. First, insofar as Florida P&L was concerned, FloridaGold Coast or its parent, Cable Holdings, was the owner of the two systems. The pole license agreements with Florida P&L were in the name of FloridaGold Coast, not D&D, and the payments under those agreements were made to Florida P&L by Cable Holdings, not by D&D. We think that it is particularly odd that the payments for pole rentals were made by Cable Holdings, rather than by D&D's joint venturer/systems manager -- DVC. Petitioner has suggested no reason why Cable Holdings and FloridaGold Coast, rather than DVC or D&D, would represent the Dania and Davie systems in transactions with Florida P&L. We can think of only two reasons why DVC or D&D would not have dealt with Florida P&L -- either Mr. Treibick and the other entities involved with the systems considered Cable Holdings and its affiliates the true owner of the systems, or Mr. Treibick or D&D did not want Florida P&L to know of the involvement of D&D and DVC with the two systems. Either scenario -- the purported seller not considering *215 the systems owned by the purported purchaser or the parties to the purported sale desiring to shield the identity of the purported purchaser -- militates against a finding that D&D owned the systems. Since petitioner has suggested no alternative explanation for the dealings with Florida P&L, they only reinforce respondent's argument that D&D was not the true owner of the systems. Second, the 1978 and 1979 editions of Television Factbook, a major reference publication for the broadcast and cable industries, list Mr. Treibick, not D&D, as the 100-percent owner of Dania and Davie systems. [20] Respondent's expert testified that the information in that publication is supplied by the cable companies. Petitioner objected to this proposed finding by stating that Television Factbook does not verify independently the owners of a CATV system. Petitioner, however, misses the point in looking to Television Factbook. If, as respondent's expert testified and petitioner apparently concedes, the cable companies supplied the information to Television Factbook, then either D&D or DVC must have been responsible for informing the publication that Mr. Treibick was the owner of the systems. Such *216 a fact implies again that the parties, D&D and Mr. Treibick's corporations, did not view D&D as the true owner of the systems. Even if such an inference is somehow refutable, the fact that third parties consulting the publication would view Mr. Treibick as the owner of the systems weighs against a finding that D&D was the true owner of the Dania and Davie systems. The fourth factor given in the Falsetti and Grodt & McKay Realty, Inc. cases was whether the contract created a present obligation on the seller to execute and deliver a dead and a present obligation on the purchaser to make payments. In form, D&D and Cable Holdings may have comported with such obligations. A deed would not have been required for a sale of equipment, such as the CATV systems, and D&D and Cable Holdings did execute a security agreement and a promissory note which obligated D&D to make payments. The agreements between Davie Cable and D&D, in which D&D sold the Dania *217 and Davie systems, also seemingly recognized that the Cable Holdings note was a valid debt for which D&D still remained liable. The agreements provided that Davie Cable would relieve D&D of the liability for and assume (1) the Cable Holdings note in the outstanding principal amount of $ 1,200,000 (the original principal amount) and (2) accrued interest on the note in the amount of $ 252,000 (interest on $ 1,200,00 for 1977, 1978, and 1979 at the rates provided in the note). The substance of the transaction, however, does not comport with the form that petitioner prays for us to respect. The actions of D&D and Mr. Treibick's corporations do not indicate that any present obligation ever existed. According to the repayment schedule set forth in the Cable Holdings note, D&D was to have paid $ 80,528 in principal and $ 319,992 in interest through January 1980, when D&D putatively reconveyed the systems to Mr. Treibick's corporations. Yet, D&D never made a principal payment on the note and never paid any interest on the note after the initial $ 76,000 prepayment. [21] DVC was obliged to pay the expenses of the Dania and Davie Joint Venture, including the expenses of debt service, yet *218 DVC obviously made no such debt service payments since the full principal and three years of accrued interest remained unpaid on the note as of January 1980. Moreover, despite the absolute absence of payments on the note after its execution, Cable Holdings never attempted to enforce any of the remedies available by virtue of D&D's nonpayment. In short, during the period that D&D was the nominal owner of the Dania and Davie systems, the creditor (Cable Holdings), the creditor's affiliate (DVC), and the debtor (D&D) never respected the terms of the note. Petitioner has the burden of proof. Rule 142(a). Yet, he has forwarded no reason why we should respect the terms of the agreements when his partnership and Mr. Treibick's corporations did not. We also decline to respect the note, and we find that there was no present obligation on the part of D&D to make payments for the CATV equipment. Cf. Ronnen v. Commissioner,90 T.C. 74 (1988) ("a high degree of adherence to the contractual terms" of the transactions was cited by the Court as a factor to support recognition of a sale of property for tax purposes). In short, the nonrecourse Cable Holdings note lacked "purpose, *219 substance, or utility apart from [its] anticipated tax consequences." Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). An additional negative factor to petitioner's argument is the fact that possession of the CATV equipment was not in the control of D&D or any of its partners. As it controlled the day-to-day operations of the systems, DVC was the only entity ever in possession of the Dania and Davie systems. Corporations controlled by Mr. Treibick *220 also owned and controlled the headend necessary for reception of the cable transmissions and the franchises necessary for operation. We thus find that possession of the Dania and Davie systems remained in Mr. Treibick's hands and was never transferred to D&D. Another benefit of ownership that D&D never possessed was the right to use the systems' assets as collateral. Cable Holdings at all times had the right to refinance the Dania and Davie systems, and D&D was required to execute any documents necessary to accommodate such a refinancing. Moreover, D&D was required to obtain the consent of Cable Holdings before it could encumber in any way the Dania and Davie systems. That Cable Holdings, and not D&D, had the right to borrow against the systems is simply a further indication that D&D was not the true owner. This Court has noted often that a significant disparity between the purchase price and the fair market value of property to be purchased strongly militates against a finding that a true sale has taken place. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. at 1240-1241. See also Falsetti v. Commissioner,85 T.C. at 351; Elliott v. Commissioner,84 T.C. 227, 245 (1985), *221 affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Odend'hal v. Commissioner,80 T.C. 588, 604-605 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984); Brannen v. Commissioner,78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Hager v. Commissioner,76 T.C. 759, 774-775 (1981); Narver v. Commissioner,75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir. 1982). In this context, the Ninth Circuit has stated, An acquisition such as that of [the taxpayer's] if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale. No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under *222 these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. While this chance undoubtedly influenced the Tax Court's determination that the transaction before us constitutes an option, we need only point out that its existence fails to supply the substance necessary to justify treating the transaction as a sale ab initio.It is not necessary to the disposition of this case to decide the tax consequences of a transaction such as that before us if in a subsequent year the market value of the property increases to an extent that permits the purchaser to acquire an equity. [Fn. ref. omitted.]
Estate of Franklin v. Commissioner,544 F.2d at 1048-1049. See also Elliott v. Commissioner, 84 T.C. at 345; Odend'hal v. Commissioner,80 T.C. at 605; Narver v. Commissioner,75 T.C. at 99. Respondent's expert witness estimated that "complete construction of a 100+ mile stand-alone cable system to serve Davie and Dania would have required in 1976 about $ 1.372 million to $ 1.543 million." *223 D&D's agreement with Cable Holdings, however, did not provide for a headend, drops or converters; it provided only for cable distribution plant. Respondent's expert witness estimated that the reasonable cost in 1976 of only the cable plant called for in the agreement would have been no more than $ 1,000,000. Petitioner presented no expert witness and has not adequately refuted the value given by respondent's expert, so we find that the CATV equipment nominally purchased by D&D had a fair market value of $ 1 million in 1976. If the face value of the Cable Holdings note is included in the purchase price, D&D's stated price to purchase the $ 1 million of CATV equipment was either $ 1.4 million or $ 1.685 million. [22] Obviously, that stated purchase price for the Dania and Davie assets far exceeded the assets' fair market value. *224 The CATV systems would have had to increase in value at least 20 percent from the value at the time of D&D's "purchase" before their value would approximate even the original note principal of $ 1,200,000. In addition, the disparity between the $ 1,200,000 note principal and the fair market value of the assets may have been even greater once D&D retransferred the franchise right to Mr. Treibick's corporations in early 1977. Although his valuation for 1976 of the cable equipment apparently presumed ownership of the franchises by D&D, respondent's expert noted that a CATV system itself is worth only the nominal scrap value of the equipment without the governmentally granted franchise right. The value of D&D's tangible CATV assets quite possibly was even less than the $ 1 million amount cited by respondent's expert, given that a third party (unrelated to Mr. Treibick's corporations) would be required to negotiate with Mr. Treibick, as well as D&D, before it could acquire any right to operate the Dania and Davie systems. Finally, the disparity between the value of the assets and the note constantly increased as the interest and principal payments due on the note went unpaid. In *225 short, as time passed during D&D's ownership of the systems, D&D's equity in the systems never increased; D&D's equity in fact decreased every time interest on the note accrued and was not paid. In such a situation a significant benefit of ownership -- equity in the property -- is absent. See Estate of Franklin v. Commissioner,544 F.2d at 1048; Narver v. Commissioner,75 T.C. at 100-101. The fact that D&D apparently made payments of $ 682,000 at the outset of the transaction does not change the fact that D&D did not acquire an equity investment in the property. At most, the payments represented fees paid to Mr. Stein and petitioner (via Realtec) plus an option price paid by D&D to obtain the right to participate in a subsequent resale of the systems. See Estate of Franklin v. Commissioner, 64 T.C. at 771. If D&D decided to abandon its interest in the systems and not exercise its option, the partners would lose their $ 703,500 investment, and Mr. Treibick's corporations would obtain complete ownership of the property. The D&D partners, however, would have more than recouped their cash out-of-pocket payments through tax savings, *226 making them net cash winners. [23]
Petitioner's position is damaged most, however, when we examine which party bore the risk of loss to the property and which party received the benefits of the profits from the sale of the systems. Mr. Treibick's corporations, not D&D, assumed the downside risks and retained the upside potential. The Joint Venture required DVC to pay all the expenses associated with the Dania and Davie systems through 1976. After 1976, DVC was required to advance funds to cover all operating deficits of the systems, including *227 the Cable Holdings note. No such requirement was placed upon D&D. Thus, D&D's risk in regard to the Joint Venture was only that DVC might not make good on its promise to pay the deficits. Such a risk is not the risk normally associated with ownership for tax purposes. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. at 1242. We find that D&D also had no risk on the Cable Holdings note which was nonrecourse to D&D and its partners. We have found that D&D had no present obligation to make payments on the Cable Holdings note. The absence of personal liability on the note thus reduces the obligation in economic terms to a mere chance that a genuine debt obligation may arise. Estate of Franklin v. Commissioner,544 F.2d at 1049. We note one last indication that the benefits and burdens of ownership remained with Mr. Treibick's corporations instead of D&D. When the systems ultimately were sold to Buford, D&D's partners received exactly the amount of cash they paid for their original capital contributions, and no more. The amount of the purchase price paid by Buford that is attributable to the Dania and Davie systems is between $ 2 million *228 and $ 3.5 million, depending upon whether the measure for proration is based upon homes located within the franchise area or upon actual subscribers. The D&D partners, however, only received their original $ 703,500 partnership investment on account of the sale of the systems. Although D&D was absolved of its liability on the $ 1,452,000 outstanding on the Cable Holdings note, we have found that that note was only a "mere chance to acquire an equity in the future," not a present obligation. The fact that D&D ultimately was repaid the exact amount of its partners' capital contributions indicated to us that the partnership never acquired the most significant benefit and burden of ownership, namely, the potential of realizing a profit or loss on the sale of the equipment. See Gefen v. Commissioner,87 T.C. 1471, 1492 (1986); Estate of Thomas v. Commissioner,84 T.C. 412, 434 (1985). In conclusion, after carefully considering all the facts and circumstances surrounding D&D's transactions with Mr. Treibick's corporations, we find that the benefits and burdens of ownership of the CATV systems never passed to D&D. Petitioner has shown nothing more *229 than that D&D, in substance, was a poorly secured creditor of Mr. Treibick's corporations. See Currier v. Commissioner,51 T.C. 488, 494 (1968). What pretended to be a sale of the CATV systems was in substance a loan -- a method by which Mr. Treibick's corporations could finance part of the costs of the construction of the systems -- for which the lender (D&D) received the assignment of tax benefits, rather than interest, for the use of its money. D&D had no interest in the CATV systems, which at all times remained under the dominion and control of Mr. Treibick's corporations. In short, for purposes of Federal taxation, we find that no true sale has taken place. In that we have found that the transactions between D&D and Mr. Treibick's corporations did not constitute a sale of the CATV systems, respondent's disallowance of depreciation and ITC from D&D was proper. Only Mr. Treibick's corporations, not D&D, ever had any investment in the CATV assets. Estate of Franklin v. Commissioner,544 F.2d at 1049. Similarly, we must deny petitioner's claimed interest expense deductions in accordance with our finding above that D&D never had any genuine *230 present debt obligation. With respect to D&D's deductions for other expenses, respondent asserts that (1) there is no evidence that payment for any of those expenses ever was made; even if the payments were made, (2) they were not ordinary and necessary expenses, or (3) they were nothing more than syndication costs. Respondent thus contends that, upon any of those bases, no deduction should be allowed for the expenses. Petitioner bears the burden of proof because respondent's determinations in the notices of deficiency are presumptively correct. Rule 142(a). We think that the payments from the partners' initial capital contributions of $ 703,500 were made essentially as outlined in the Memorandum. If the fees due to Mr. Treibick's corporations had not been paid, we doubt that Mr. Treibick would have continued to allow D&D to remain involved with the systems. We also suspect that, during his testimony at trial, Mr. Treibick readily would have informed us if D&D has not paid the almost $ 600,000 that was due to his corporations. We have seen no evidence, however, to indicate that any of the subsequent operating expenses ever were incurred by D&D. Instead, it appears that *231 Mr. Treibick's corporations incurred whatever expenses were generated by the ongoing operation of the systems. We thus uphold respondent's determinations with respect to the expenses of the ongoing operation of the systems. As for the payments made from the original capital contributions, we have stated: To be deductible by the partnership, the fees must satisfy the requirements of section 162(a). Section 162(a) generally allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." In determining whether any of the fees are deductible under section 162(a), "we look to the nature of the services performed [for which the fees were paid] * * * rather than to their designation or treatment by the partnership." Estate of Boyd v. Commissioner,76 T.C. 646, 658 (1981), quoting Cagle v. Commissioner,63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Payments allocable to organizational expenses and acquisition costs must be capitalized. Sec. 263; Woodward v. Commissioner,397 U.S. 572, 576 (1970); Estate of Boyd v. Commissioner, supra. *232 [Petitioner] bear[s] the burden of proving what portion of the fee is allocable to non-deductible capital portions and to deductible expense portions ( Estate of Boyd v. Commissioner, supra) and such allocation must reasonably comport with the value of the services performed. Merians v. Commissioner,60 T.C. 187 (1973). * * *
Wildman v. Commissioner,78 T.C. 943, 957-958 (1982). [24]
*233 We found that the rights that D&D received by entering into the Warranty Agreement and the Non-Competition Agreement had only minimum value, certainly nowhere near the $ 160,000 that D&D deducted for payments on those agreements. We agree with respondent's assertion that these fees were excessive, and thus unnecessary, and that no deductions should be allowed therefor. Petitioner has suggested no other grounds to support a deduction for those expenses. We therefore uphold respondent's determination and find that D&D is not entitled to a deduction for any portion of those payments. Rule 142(a). On its 1976 tax return, D&D deducted $ 125,120 for operating expenses. That amount apparently corresponds to the $ 125,000 payment out of the initial capital which was to be paid for start-up costs to the Joint Venture (from which Realtec's $ 86,000 fee was to be paid). The finder's fee to Realtec essentially was a cost of organization; petitioner gives no explanation whatsoever to explain how the remainder of the $ 125,000 was used. Petitioner has shown us no authority to support a deduction for any part of the $ 125,000 payment to the Joint Venture, and we uphold respondent's disallowance *234 of the deduction. Rule 142(a). [25]
On its 1976 tax return, D&D also deducted $ 13,500 for management fees, $ 46,500 for administrative expenses, and $ 36,000 for advisory fees. The sum of those three amounts is $ 96,000, which is the amount of the payment that was to be made to the general partner, Mr. Stein, for his services. Petitioner has advanced no evidence to explain the allocation on the tax return of what obviously are Mr. Stein's fees. The Memorandum asserted that $ 70,000 of that payment would be paid for "sales expenses" and $ 12,500 would be paid for legal fees. The legal fees and sales expenses appear to be amounts for preparation of the Memorandum and other documents and for the promotion and sale of partnership units. Similarly, the remainder of the payment to *235 Mr. Stein (the amount he was to keep for his own services) appears to be a fee to him for his efforts in promoting and selling units in the partnership. Petitioner certainly has not satisfied his burden to prove that these payments were for expenses other than organizational or syndication costs. We thus uphold respondent's determination and find that no deduction is allowed for management fees, administrative expenses, and advisory fees. In summary, we have upheld respondent's disallowance of deductions taken by D&D for the years at issue, and required any payments actually made by D&D to be capitalized. We also hold that no gain or loss was recognized by petitioner upon the 1980 transfer by D&D of the systems to Mr. Treibick's corporations, since Mr. Treibick's corporations paid D&D the exact amount of the sum total of the D&D partners' original capital contributions. [26]
*236 CHINCO PROPERTIES FINDINGS OF FACT The terms used in the remainder of our opinion may be similar to those used in our discussion of D&D; however, unless otherwise stated, the terms used hereinafter will refer only to Chinco Properties. Chinco Properties ("Chinco") is a New York limited partnership formed in 1976 to acquire and exploit the franchise and equipment of a CATV system located in Chincoteague, Virginia. Petitioner was a limited partner in Chinco and owned a 4.95 percent share of the partnership. In exchange for his limited partnership interest, petitioner agreed to pay $ 35,000 to Chinco. A Private Placement Memorandum ("Placement Memorandum"), dated December 10, 1976, was prepared in connection with the offering of partnership interests in Chinco. The Placement Memorandum stated that Chinco would enter into several agreements with CACO, Inc. ("CACO") and with RSC, Inc. ("RSC"). CACO is a Connecticut corporation formed on November 22, 1976, the purpose of which was to "acquire, construct, develop, manage and generally deal in CATV systems." During the years at issue, the officers and directors of both CACO and RSC were Anthony Desimone, Stuart Spitz, and petitioner. *237 Messrs. Spitz and Desimone were also limited partners in Chinco. On November 27, 1976, petitioner, as corporate secretary of CACO, wrote Acton Corporation ("Acton") to confirm an offer by CACO to purchase the cable television systems in Crisfield, Maryland, and Chincoteague, Virginia. The cable television system in Chincoteague had been in operation since 1965 and had been rebuilt in 1971. On December 22, 1976, CACO, Crisfield CATV, Inc., Bluefield Cable Corporation ("Bluefield"), and Acton entered into a purchase agreement whereby CACO agreed to purchase all the assets of the CATV systems located in Crisfield and Chincoteague. In consideration for the systems, CACO agree to pay $ 565,000 for each of the systems -- $ 5,000 per system to be paid upon execution of the agreement, $ 210,000 per system to be paid at closing, and $ 350,000 per system to be paid by two notes payable six months from the closing with interest at 7%. On December 30, 1976, Bluefield executed a bill of sale which declared that it had sold to CACO its complete CATV system serving Chincoteague. The bill of sale stated that the property sold was all tangible personal property and all leases, contracts, *238 and agreements used in connection with the system, including the franchise and all pole line agreements. The bill of sale also stated that the purchase price for the assets conveyed thereunder was $ 565,000. On December 30, 1976, CACO executed a promissory note in which CACO promised to pay Acton the sum of $ 350,000 on June 30, 1977, as well as interest payable monthly at the rate of 8 percent per annum. The promissory note was secured only by the assets of the Chincoteauge system. On May 6, 1977, Acton and CACO agree to amend the note and provided that the entire amount owed to Acton was $ 317,069.06. During the years at issue, Marvin Hodas was the sole general partner of Chinco. The Placement Memorandum stated that Mr. Hodas had been the president of Marvin Associates, Inc., a hair fashion salon in New York, since 1963. The Placement Memorandum further stated that Mr. Hodas had had no experience in any phase of the CATV industry. The Placement Memorandum also asserted that Mr. Hodas would contribute $ 7,000 to the partnership and receive a one percent interest in partnership profits and losses. The Placement Memorandum also provided that Mr. Hodas would receive $ 35,000 *239 as compensation for his services rendered in connection with the operation of Chinco and that he would pay all legal and accounting fees out of the $ 35,000. The Placement Memorandum and Amended Limited Partnership Agreement provided that limited partnership units were to be sold only to persons who met certain minimum standards of income and net worth, [27] who were in a position to benefit from the applicable tax laws with respect to such investments, who had knowledge or prior investment experience or had consulted a professional advisor, who understood the speculative nature of the investment, and who were able to bear the economic risk of the investment. On December 31, 1976, CACO and Chinco entered into an Equipment Agreement whereby CACO agreed to transfer to Chico the equipment used in the operation of the CATV system serving the area surrounding Chincoteague, Virginia. In exchange for *240 the equipment, Chinco agreed to pay CACO $ 100,000 in cash and to execute a nonrecourse promissory note in the principal sum of $ 1,460,000. The Equipment Agreement also contained the following provision: The Seller at all times shall have the right to refinance the equipment. If the seller borrows solely against this equipment, the refinanced principal obligations shall never exceed the balance of the purchase money mortgage hereunder plus accrued interest. If the Seller borrows against a group of assets of which the equipment listed in Schedule 1.1 is only a part, then the Seller agrees not to borrow an amount exceeding the fair market value of the group of assets for which refinancing is sought. On December 31, 1976, Chinco also executed in favor of CACO a Security Agreement and a Non-Recourse Promissory Note (the "CACO note"). The Security Agreement provided that the CACO note was secured by the CATV equipment and the franchise, that Chinco had no personal liability in connection with the note, and that Chinco would not be liable for any deficiency arising in case of a resale or repossession of the equipment upon default on the note. The CACO note provided that payments *241 thereon were to be made on June 30 and December 31 of each year for which payments were specified. The note also provided that all sums paid were to be applied first to accrued interest and then to the reduction of principal. Interest on the unpaid principal of the note was to be paid at the rate of 5 percent per annum. A payment schedule that was attached to the note provided that CACO was to make payments as follows: APPROXIMATE
INTEREST
PRINCIPAL
TOTAL
REMAINING
YEAR
PAYMENT
PAYMENT
PAYMENT
BALANCE
1976
$ 24,333
$    -0-
$    24,333
$ 1,460,000
1977
73,000
$    -0-
73,000
1,460,000
1978
73,000
$    -0-
73,000
1,460,000
1979
72,650
7,350
80,000
1,452,650
1980
72,282
7,718
80,000
1,444,932
1981
71,491
8,509
80,000
1,428,390
1982
71,491
8,509
80,000
1,419,456
1983
71,066
8,934
80,000
1,419,456
1984
70,973
9,027
80,000
1,410,429
1985
70,522
9,478
80,000
1,400,951
1986
70,048
9,952
80,000
1,390,999
1987
69,550
10,450
80,000
1,380,479
1988
-0-
1,380,479
1,380,479
-0-
An unreferenced footnote to the payment schedule stated that, upon the due date of the balance *242 of the note, "If the fair market value of the assets securing the Note is equal to the balance, the holder of the Note will enter into a new note covering such balance." That footnote also stated that the due date of the balance was January 1, 1988. [28]
No payment of principal was made on the CACO note during the years at issue, and no principal payment had been made as of the end of 1983. The latter finding is based upon an unaudited compilation of the balance sheet of Chinco as of December 31, 1983, submitted by Daniel L. Lieberman, Certified Public Accountant. That balance sheet compilation showed that Chinco's liabilities included, inter alia, "Long-Term Debt-Note Payable-Equipment" in the amount of $ 1,460,000 and "Due to CACO" in the amount of $ 349,683. Similar balance sheet compilations as of the end of years 1979 through 1982 also showed the outstanding note payable in the amount of $ 1,460,000 and *243 amounts due to CACO of $ 113,483, $ 183,483, $ 223,483, and $ 296,483. On December 31, 1976, Chinco and CACO entered into three additional agreements -- a Franchise Sale Agreement, an Equipment Warranty, and a Non-Competition Agreement. The Franchise Sale Agreement provided that, in exchange for $ 15,000, CACO would sell to Chinco the CATV franchise for Chincoteague "subject to the approval of the Chincoteague City Council." [29] The terms of the franchise from the municipality were such that the Chincoteague town council annually decided whether to renew the current operator's franchise or terminate that operator's franchise. In the Equipment Warranty, CACO agreed to warrant the CATV equipment against technological obsolescence, casualty loss, and inherent defects for the period from December 31, 1976, to December 31, 1978. In consideration for CACO's Warranty, Chinco agreed to pay CACO $ 200,000. The Non-Competition Agreement provided that, for the one year period of December 31, 1976, until December 31, 1977, CACO agreed *244 not to compete with Chinco's CATV system in Chincoteague. In consideration for the agreement, Chinco agreed to pay CACO $ 50,000. The Non-Competition Agreement was unusual and unnecessary in that an affiliate (RSC) of the party agreeing not to compete (CACO) entered into a Joint Venture to manage the systems and share in the system's profits. (The Joint Venture is discussed below.) It is highly unlikely that CACO would have competed against the Chinco/RSC venture in Chincoteague because such competition would have adversely affected the interest of CACO's sister corporation, RSC. Additionally, the Non-Competition Agreement had no value because the Chincoteague town council, on December 6, 1976, had resolved that the franchise right, which CACO had acquired from Acton and then transferred to Chinco, was effective until March 7, 1978. The Town of Chincoteague likely would not have given authority for another cable franchise until the outstanding franchise expired, over two months after the Non-Competition Agreement expired. The Placement Memorandum summarized Chinco's agreements with CACO as follows: CACO has acquired the System, including the right to convey the Franchise *245 and the Equipment from an independent third party at prices significantly below those that will be paid by the Partnership for the same assets. Accordingly, CACO will make a substantial profit in connection with the transactions described herein. Furthermore, CACO is purchasing the assets that it will sell to the Partnership immediately prior to selling them to the Partnership and will use the proceeds that it will receive from the Partnership to consummate its purchase. [Underscoring in original.] On December 31, 1976, Chinco and RSC entered into a Joint Venture which was formed for the purpose of management of the CATV system in Chincoteague. The Joint Venture agreement provided that the Joint Venture would commence on January 1, 1977, run for a period of ten years from that date, and be renewable on a yearly basis thereafter. RSC agreed to serve as manager of the system and Chinco agreed to contribute the franchise and equipment comprising the system. The agreement provided that all equipment added to the system would be the property of Chinco and not the property of the Joint Venture. The agreement also provided that the expenses of the system would be charged to *246 Chinco's capital account, except for expenses incurred during the startup [30] period which were to be allocated and charged to the capital account of RSC. The Joint Venture agreement provided that "Chinco shall pay all costs and expenses for the operation" of the system. It also provided that all revenues resulting from the operation of the system would be allocated on an annualized basis as follows: 1. To operating expenses. 2. Five percent of gross revenues generated by the operation of the System to RSC but in no event less than $ 10,000. 3. To fixed debt service. 4. Beginning in the year 1977, to Chinco, on a noncumulative basis, an annual priority cash payment (the "Partnership Priority Payment") of up to $ 36,000. 5. Also commencing in the year 1977, to RSC on a noncumulative basis up to $ 36,000 (the "RSC Priority Payment"). 6. Any balance will be distributed 50% to RSC and 50% to Chinco. The Joint Venture agreement further provided that if Chinco sold or refinanced the system, the proceeds of such sale or refinancing would be allocated as follows: 1. An amount *247 to Chinco necessary to repay the balance of the [CACO note] or any extension thereof. 2. After the repayment of the balance of the [CACO note] and assuming RSC is still a participant in the Venture, up to an additional $ 450,000 to Chinco and 50% of any balance to Chinco and 50% to RSC. On December 31, 1976, Chinco and RSC also entered into a System Transfer Agreement and into a System Analysis Agreement. Under the System Transfer Agreement, RSC agreed to provide supervisory services to Chinco with respect to the initial marketing campaign for the system, the hiring and training of personnel for the operation of the system, and the installation of bookkeeping and billing systems for Chinco. In consideration for those services, Chinco agreed to pay RSC $ 100,000 by December 31, 1976, and $ 50,000 by December 31, 1977. The agreement provided that the term of the agreement was from the date of execution until December 31, 1977. Under the System Analysis Agreement, RSC agreed "to provide Chinco with a study of management operations in connection with Chinco's operation of its CATV System and of the opportunities for expansion of such System" in return for the payment of $ *248 45,000 by Chinco. On March 22, 1977, Chinco and RSC executed another Joint Venture agreement, amending the original Joint Venture agreement in its entirety. The amended agreement was substantially similar to the original agreement with the exception of the following, which were in the original but were omitted from the amended agreement: (1) a clause providing for the contribution by Chinco to the capital of the Joint Venture during 1976; (2) Chinco's warranties that (a) it was the owner of the franchise, (b) it was, to the best of its knowledge, in substantial compliance with all of the terms and conditions of the francise, and (c) it had "received no notice of default which [had] not been cured and the Franchise [was] in full force and effect"; and (3) a clause providing that RSC's failure to remit to the Joint Venture any payment when due and the continuance of such failure for a period of thirty days thereafter would constitute a default by RSC. At the time Chinco and RSC entered into the Joint Venture, the officers and directors of RSC (petitioner and Messrs. Desimone and Spitz) had had no experience in the management of CATV systems. Accordingly, RSC retained *249 the services of Smith, Cooper Associates ("SCA") to operate the system on a day-to-day basis. Although these other organizations were involved with the system, the Town Council of Chincoteague recognized Chinco Properties, trading as Coastal Cable TV, as the owner of the franchise and system. The Amended Limited Partnership Agreement provided that the initial capital of Chinco would be $ 707,000. The Placement Memorandum stated that those funds would be used as follows: Amount
Purpose
$ 100,000
Down payment for equipment
15,000
Franchise purchase
50,000
Non-Competition Agreement
150,000
System Transfer Agreement
50,000
System Analysis Agreement
200,000
Warranty
24,333
Interest on CACO note
35,000
Payment to general partner. Out of
this amount, Mr. Hodas was responsible
for the payment of legal and
accounting fees of approximately
$ 20,000.
70,000
Syndication costs
12,667
Working capital
$ 707,000
The Placement Memorandum also noted that a finder's fee of $ 140,000 would be paid to MDS Properties, Corp. ("MDS") by CACO out of the amount received *250 by it from Chinco. MDS was a limited partner in Chinco and had an ownership interest of approximately 27 percent. No checks or other documentary evidence are in evidence to show that any of the payments mentioned above were ever made. Also, no books of accounts or other records of Chinco that could authenticate such payments have been presented as evidence. The Placement Memorandum which was distributed to the partners had several exhibits appended to it. Included among those exhibits were one entitled "Statement of Projected Cash Flow to be Distributed to Limited partners" and another entitled "Statement of Projected Estimated Net Taxable Income (Loss), Tax Savings (Tax Costs) Assuming a 60 Percent Effective Tax Rate, Cash Flow, Investment, and Excess of Tax Savings and Net Cash Flow Over Investment to a Limited Partner Acquiring One Unit." Those exhibits are included in our opinion as Appendix 1 and Appendix 2, respectively. When Chinco acquired the Chincoteague system in late 1976, there were approximately 2100 dwelling units within the cable franchise area; approximately eighty percent of those units already subscribed to the cable system. The Placement Memorandum stated *251 that "it is unlikely that the System will experience any significant growth in regular monthly subscriber revenues." Although Chincoteague is a popular tourist area for residents of the Baltimore-Washington Metropolitan area, [31] Chincoteague's tourist trade is largely seasonal. The town did not have sufficient industry to attract many new full-time residents, and there were no expectation of any significant growth in industry. In short, as of the date of Chinco's purchase of the system, there was little potential for the number of homes in the Chincoteague franchise area to increase significantly. For Federal tax purposes, Chinco used a calendar year and reported its income on the accrual method of accounting. Chinco reported income and expenses on its partnership tax returns for the year ending December 31, 1976, and calendar years 1977 through 1980 as follows: Income
1976
1977
1978
Gross Profit
$      664 $  121,110 $  124,661 Interest
-0- 6,692 1,607 Total Income
$      664 $  127,802 $  126,268 Expenses
Interest
$    6,083 $   80,204 $   76,790 Depreciation
39,000 456,300 319,410 Amortization
54 14,652 14,652 Management Fees
35,000 5,680 8,804 Warranty Fee
8,000 96,000 96,000 Supervisory Fee
100,000 50,000 -0- System Analysis Fee
50,000 -0- -0- Non-Competitive Fee
50,000 -0- -0- Installation Expense
-0- -0- -0- Various Others
598 100,448 84,375 Total Expenses
$ 288,735 $ 803,284 $ 600,031 Net Income (Loss)
$ (288,071)
$ (675,482)
$ (473,763)
*252 Income
1979
1980
Gross Profit
$  137,625 $  194,711 Interest
8 -0- Total Income
$  137,633 $  194,711 Expenses
Interest
$   73,000 $    73,858 Depreciation
312,284 314,227 Amortization
14,652 14,652 Management Fees
*   10,288 Warranty Fee
-0- -0- Supervisory Fee
-0- -0- System Analysis Fee
-0- -0- Non-Competitive Fee
-0- -0- Installation Expense
-0- 37,545 Various Others
* 96,379 149,562 Total Expenses
$  496,315 $  600,132 Net Income (Loss)
$ (358,682)
[32] $ (405,421)
*253 On his individual income tax returns, petitioner reported his share of losses and ITC from Chinco as follows: 1976
1977
1978
1979
1980
Net Loss
$ 14,260
$ 33,436
$ 23,451
$ 17,755
$ 17,242
ITC
330
-0-
-0-
-0-
166
The losses reported by petitioner for the years at issue total $ 106,144. OPINION We now must decide whether petitioner's claimed losses and ITC from Chinco are properly allowable. Petitioner has the burden of proving that respondent's determinations in the notices of deficiency are incorrect. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). In the notices of deficiency issued for the years 1976 through 1979, respondent disallowed the losses and ITC from Chinco; petitioner therefore has the burden of proof for those years. The notice of deficiency for the 1980 taxable year did not mention Chinco and did not disallow any deductions or ITC from Chinco. Respondent asserted his disallowance of the ITC and the loss from Chinco for 1980 in an amendment to his answer; respondent therefore has the burden of proof for the 1980 year. Rule 142(a); Achiro v. Commissioner,77 T.C. 881, 890 (1981). *254 Respondent raises a multiplicity of alternative arguments to support his disallowance of the losses and ITC. One of respondent's primary arguments is that petitioner's activities with respect to Chinco were not entered into with a bona fide profit objective as required by section 183. Section 183(a) provides the general rule that an individual will not be allowed any deduction attributable to an activity "if such activity is not engaged in for profit." [33] In the case of a partnership, the determination of whether an activity is engaged in for profit is made at the partnership level. Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In order to avoid the effect of section 193, the partnership must have engaged in the activities in issue with the actual and honest objective of making a profit. Finoli v. Commissioner,86 T.C. 697, 722 (1986); Surloff v. Commissioner,81 T.C. 210, 233 (1983); Dreicer v. Commissioner,78 T.C. 642, 644 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although a reasonable expectation of profit is not required, *255 the taxpayer's profit objective must be bona fide. Finoli v. Commissioner, supra;Surloff v. Commissioner, supra;Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published sub nom. Krasta v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner734 F.2d 5 (3d Cir. 1984). The inquiry turns on whether the primary purpose and intention of the partnership is engaging in the activity was to make a profit. Finoli v. Commissioner, supra;Fox v. Commissioner,80 T.C. at 1006-1007. As used in this context, the term "profit" means *256 economic profit, independent of tax savings. Surloff v. Commissioner, supra.
*257 The determination of whether a profit objective exists is to be resolved on the basis of all the attenuating facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Greater weight, however, is given to objective facts than to mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner,80 T.C. at 1007; Dreicer v. Commissioner,78 T.C. at 645. The regulations set forth the following factors to be considered in the determination of whether an activity is engaged in for profit: (1) the manner in which the taxpayer carries on an activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with *258 respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs. The issue is to be resolved not on the basis of any one factor, but on the basis of all the surrounding facts and circumstances. Fox v. Commissioner,80 T.C. at 1007; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981); Allen v. Commissioner,72 T.C. 28, 34 (1979). Even though the motive of the partnership is the focus of our inquiry, our inquiry is not to be confined solely to the activities of the partnership where the partnership is virtually passive in its operations, as was Chinco. Flowers v. Commissioner,80 T.C. 914, 932 (1983). As we noted in Flowers,
those parties possessing resources sufficient to acquire and exploit investment property are not always blessed with corresponding expertise. In such case, a partnership can rely upon the expertise of third parties by contractually assigning most of the normal duties and responsibilities associated with the income-generating operations *259 to such parties. The scope of the relevant inquiry therefore expands to encompass the entirety of such multilayered transactions. See Siegel v. Commissioner, [78 T.C. 659, 700-702 (1982)]; Brannen v. Commissioner, supra at 509-511. However, the profit motive issue must still be assessed from the perspective of the partnership. Thus, where the partnership is virtually passive in its operations, the prudence it exercises in acquiring property and in assigning duties to third parties, and the care with which it oversees the performance of such duties are of heightened importance. [Emphasis supplied.] [Fn. ref. omitted.]
80 T.C. at 932. See also Fox v. Commissioner,80 T.C. at 1008 et seq., where in our determination of two limited partnerships' profit motive, we focused on the actions of a corporation which was run by two of the limited partners and which, though not the general partner of either partnership, in effect ran the affairs of both partnerships. Althouugh Mr. Hodas was the sole general partner of Chinco, he was not involved significantly with the operations of Chinco. For that matter, we have *260 seen nothing to indicate that Mr. Hodas had any significant involvement with the formation of Chinco or its acquisition of the Chincoteague system. The record indicates that Mr. Hodas was merely a nominal general partner who went along with the plans of CACO and RSC. Petitioner and Messrs. Spitz and Desimone, through their control of RSC (and CACO), were the ones who effectively were responsible for making partnership decisions. We recognize that RSC did hire SCA to operate the system on a day-to-day basis; however, SCA was not involved with the formation of the partnership and its acquisition of the system. SCA's involvement began only upon Chinco's acquisition of the system. We now proceed to apply the tests of section 183 to the facts at hand. The first factor provided in the regulation is the manner in which the taxpayer carried on the activity. Sec. 1.183-2(b)(1), Income Tax Regs. Although the day-to-day operations of Chinco apparently were conducted by SCA in a business-like fashion, the facts surrounding Chinco's acquisition of the system are particularly damaging to petitioner's assertion of a profit objective in this case. A significant indication that Chinco did not *261 have the requisite profit objective is the fact that the stated purchase price of $ 1.56 million [34] for the equipment is greatly in excess of the value of the system when it was transferred to Chinco in December 1976. Respondent's expert, David Korte, based his valuation of the assets of the Chincoteague system on cash flow. He asserted that the most common historical valuation method for cable systems was eight to ten times cash flow. Mr. Korte estimated that the pre-1977 cash flow of the Chincoteague system was approximately $ 37,500 per *262 year. Such a cash flow would yield a range of value for the system between $ 300,000 and $ 375,000. Mr. Korte continued, however, and noted that it would have been conservative but reasonable in 1976 to assume the addition in Chincoteague of pay TV (e.g., HBO). He then estimated that, after considering the capital cost of adding and marketing pay TV, an additional $ 23,500 of annual cash flow could be expected. Mr. Korte thus concluded that the value of the Chincoteague system was between $ 490,000 and $ 610,000, with a mid-range value of $ 550,000. Mr. Korte also noted that there was little or no chance of any significant expansion of the system because of the demographics and geographical location of the Chincoteague area. Although no expert witness testified on behalf of petitioner, the parties have stipulated into evidence a two-page appraisal of the Chincoteague system addressed to CACO and made by William L. Kepper as of April 28, 1977. Mr. Kepper concluded that the fair market value of the Chincoteague system was "$ 840,000 on a cash basis, which translates to ten times current cash flow." Respondent's expert testified that he was familiar with Mr. Kepper and that he *263 agreed with Mr. Kepper's methodology. Mr. Kepper's appraisal, however, stated, "In forming our opinion we've relied upon certain facts and information furnished to us." Among the facts upon which Mr. Kepper relied was that the system derived an annual operating profit of $ 84,000. Mr. Kepper's value of the system was ten times the quantum of cash flow that he had determined. In essence then, the valuations from both Mr. Korte and Mr. Kepper were based on cash flow multiples between nine and ten; the difference between the two valuations was that Mr. Kepper assumed an annual cash flow of $ 84,000, whereas Mr. Korte assumed an annual cash flow of $ 37,500 or $ 61,000 (including pay TV). Mr. Kepper did not testify at trial, so we do not know who provided him with his estimate of the Chincoteague system's operating profit. For that matter, we do not know whether Mr. Kepper was aware that CACO had acquired the system for $ 565,000 in December 1976, just before its sale to Chinco. We surmise that petitioner or one of the other CACO officers supplied Mr. Kepper with the information he had. Regardless of who provided that information, however, it is particularly significant that Mr. *264 Kepper was furnished with an annual cash flow estimate of $ 84,000 when the Placement Memorandum's statement of projected cash flow [35] for the years 1976 - 1984 showed that the maximum cash flow expected by Chinco in any of those years would be only $ 36,000. [36] We therefore conclude that, since Mr. Kepper did not testify to explain his appraisal and since the annual cash flow upon which Mr. Kepper relied is far in excess of the cash flow projected by either Mr. Korte or Chinco's Placement Memorandum, we can place no reliance on the value of the system given by Mr. Kepper. *265 Instead, we rely on two factors in making our finding on the fair market value of the Chincoteague system. First, Mr. Korte appraised the system at a mid-range value of $ 550,000. Second and more persuasive to us is the fact that CACO purchased the system from Bluefield/Acton for a stated price of $ 565,000. Bluefield and Acton were third parties unrelated to Chinco, RSC, or CACO, and the sale of the system by Bluefield/Acton plainly was at arm's length. We have seen no evidence to indicate that the system appreciated appreciably between December 22, the date CACO agreed to purchase it, and December 31, the date Chinco purchased it. We therefore find that the fair market value of the system purchased by Chinco on December 31, 1976, was $ 565,000. Thus, the cable system (the only asset owned by Chinco) was acquired by CACO within several days of its resale to Chinco at a cost of only approximately one third of the stated cost to Chinco. [37]
*266 The fact that Chinco purchased the Chincoteague system at a stated price so inflated above the price paid by CACO (i.e., the fair market value of the system) shows that Chinco accepted the terms of the system purchase without price negotiation. If the Chinco price had been determined through any arm's-length bargaining, we are confident that the ultimate stated transfer price would have been must closer to the true value of the system. The lack of arm's-length negotiation, as evidenced by the large discrepancy between the value of the assets and the stated purchase price, was totally inconsistent with the business-like conduct that we would expect from an entity having any "true regard for the profitability of the activity." Fox v. Commissioner,80 T.C. at 1010, quoting Brannen v. Commissioner,78 T.C. at 509. We also note that over 96 percent ($ 1.46 million/$ 1.56 million) of the stated purchase price to Chinco for the equipment was in the form of a deferred nonrecourse note, the bulk of which was not due for eleven years. The absence of personal liability and the disparity between the face amount of the Chinco note and the value of the assets *267 securing it reduce the Chinco note in economic terms to a mere chance that any genuine debt obligation may arise; repayment of the note was contingent on an almost threefold increase in the value of the system. See Estate of Franklin v. Commissioner,544 F.2d at 1049; Odend'hal v. Commissioner, 80 T.C. at 604-605, 616. As we noted in Flowers v. Commissioner,80 T.C. at 937, a purchase price that is grossly inflated by means of nonrecourse indebtedness also raises serious questions about the motives of the acquiring parties. Where there is a small cash downpayment and the remainder of the acquisition price is satisfied with nonrecourse indebtedness that is not supported by the fair market value of the property acquired, the possibility exists that the acquisition was undertaken to generate tax benefits. Thus, where other factors are present, the existence of a highly inflated nonrecourse note can contribute to the finding that the activity with respect to which the property was acquired was not entered into for profit. It is the presence of the nonrecourse indebtedness that creates the potential for shenanigans, and where it is *268 found that a transaction lacked economic motivation but rather was undertaken primarily to reduce taxes by generating deductions and credits attributable to an inflated basis derived predominantly from nonrecourse indebtedness, such indebtedness is not merely self-destructive, but can taint the entire transaction. [Fn. ref. omitted.] Another factor provided in the regulation is the expectation that the assets used in the activity will appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs. As evidence of the partnership's true expectation, we take note of an exhibit in the Placement Memorandum which we would not expect to find in promotional materials unless the activity was motivated primarily by tax savings. That exhibit summarized the significant expected tax benefits and the minimal expected financial benefits of being a Chinco partner. (That exhibit is Appendix 2 of our opinion.) That exhibit shows that a partner who purchased one partnership unit with a $ 35,000 investment (petitioner's capital contribution) could expect Federal tax savings, not merely deductions, of over $ 40,000 for the first three years. During those first three years, no cash flow from the *269 partnership was expected. Even after nine years (through 1984) the estimated cash flow to such an investor from Chinco would total only $ 9,428, or approximately one quarter of the investor's original capital contribution. The estimated tax savings over those same nine years, however, were projected to be $ 57,204. Thus, the summary exhibit showed that a Chinco investor should expect not to recoup his cash investment in Chinco within ten years, if ever; however, the investor might expect an almost two for one cash return on investment after consideration is given to the estimated tax savings from Chinco. In short, the exhibit implies that a partner can profit from Chinco only by virtue of the tax losses and ITC generated. That Chinco would include such an exhibit in its promotional materials is telling evidence that the partnership did not expect any significant profits from the system, and certainly did not expect profits sufficient to cause the system to appreciate to a level approaching the purchase price, much less to a level at which Chinco could profit from a sale of the system. [38]
*270 Additional factors provided in the regulation are the history of income and losses with respect to the activity and the amount of occasional profits, if any. Sec. 1.183-2(b) (6-7), Income Tax Regs. During the five years at issue, Chinco's tax returns reported expenses that in all years were at least triple the reported revenues. A record of such large losses over so many years is persuasive evidence that the partnership did not expect to make a profit. Brannen v. Commissioner,78 T.C. at 512; Golanty v. Commissioner,72 T.C. at 427. We last shall examine the expertise of Chinco's advisors with respect to Chinco's acquisition of the system. See sec. 1.183-2(b)(2), Income Tax Regs. There is nothing in the record to indicate that any party knowledgeable about cable television represented the partnership with respect to the acquisitions of the system.[39] Indeed, it appears that petitioner and Messrs. Spitz and Desimone were the parties responsible for arranging the whole chain of events from Acton's sale of the system to Chinco's ultimate acquisition of it. We thus shall look to the actions of the CACO/RSC officers since those individuals were *271 the parties upon whom Chinco relied. See Fox v. Commissioner,80 T.C. at 1008, Flowers v. Commissioner,80 T.C. at 934. Petitioner has not advanced any reason for the sale of the Chincoteague system immediately after its acquisition by CACO. CACO transferred the system at a stated price that was approximately three times the value of the system. We can think of only two possible reasons why the CACO owners would transfer the system at such an inflated price: (1) to inflate the cost basis on *272 which deductions for depreciation and interest expense may be computed, or (2) to make a hefty profit at the expense of the Chinco partners. In the former case, the sole purpose of such a transfer to Chinco would be to obtain an anticipated shifting of tax benefits from CACO to the Chinco partners, with such benefits artificially enhanced by the use of illusory debt. Tolwinsky v. Commissioner,86 T.C. 1009, 1050 (1086). In the latter case, such a transfer would be blatant proof of the partnership's disregard for its own profit because the partnership, by accepting the terms of the transaction, would be granting to CACO (via the CACO note) the total increase in value of the system until such time as the system's value approximately tripled. In both cases, however, Chinco's reliance on individuals who had a vested interest in direct conflict with Chinco further shows the lack of a true profit motive on the part of the partnership. In summary then, based on our analysis of all the facts and on our application of the factors in the regulation, we find that Chinco did not enter into the transactions with respect to the system with a primary profit objective. Accordingly, *273 the deductions from Chinco are subject to the limitations of section 183. Respondant's disallowance of all deductions from Chinco to the extent of reported revenues is therefore upheld. We next turn to the ITC claimed by petitioner from Chinco. We have disallowed petitioner's claimed losses by virtue of the authority of section 183. Implicit in our holding is that the partnership was not engaged in a trade or business or in an activity for which deductions are allowable under section 212(1) or (2). Sec. 183(c); Brannen v. Commissioner,78 T.C. at 499. Chinco thus was not entitled to depreciation because the system was not used in a trade or business or held for the production of income. Sec. 167(a). Since the system was not so used, no ITC is allowed for pass through to the partners. Finoli v. Commissioner,86 T.C. at 744-745; Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. in an unpublished opinion 732 F.2d 164 (9th Cir. 1984). We thus also uphold respondent's disallowance of the ITC claimed by petitioner from Chinco. [40]
*274 INCREASED INTEREST Respondent also contends that the increased rate of interest under section 6621(c) applies because the D & D and Chinco transactions were tax motivated. Section 6621(c) provides for increased interest where there is an underpayment of taxes for any taxable year attributable to one or more tax motivated transactions, and where the amount of the underpayment attributable to tax motivated transactions for the year exceeds $ 1,000. Sec. 6621(c)(2). For purpose of section 6621(c), the term "tax motivated transactions" is defined to include "any valuation overstatement (within the meaning of section 6659(c)" and "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(i) and (v). Section 6621(c) applies only with respect to interest accruing after December 31, 1984 even though the tax motivated transaction was entered into prior to the date of the enactment of section 6621(c). [41]Cherin v. Commissioner,89 T.C. 986 (1987); Solowiejczyk v. Commissioner,85 T.C. 552, 556 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). *275 Respondent makes several arguments in the alternative to support his contention that section 6621(c) applies. Specificially, respondent argues that (1) the D & D and Chinco transactions were sham transactions, (2) the entry into the transactions was motivated by the desire to achieve tax savings rather than a desire for economic profit, and (3) the transactions involved a valuation overstatement. Petitioner's briefs do not address section 6621(c); however, we shall assume that petitioner contests the increased interest because he contested the disallowance of the losses and ITC from both D & D and Chinco. We have disallowed petitioner's deductions and ITC from D & D and disregarded the transactions between D & D and Mr. Triebick's corporations for tax purposes because the benefits and burdens of ownership did not pass to D & D. We did not find that petitioner's investment in D & D was motivated by tax savings instead of by a desire for economic profit. We also did not find that D & D's investment in the Dania and Davie systems was a sham, i.e., a simple expedient of drawing up papers solely to obtain tax benefits. Cf. Falsetti v. Commissioner,85 T.C. at 355. *276 Nevertheless, our finding that the benefits and burdens of ownership of the systems did not pass to D & D leads to a conclusion that D & D's correct adjusted basis in the assets making up the Davie and Dania systems is zero. Zirker v. Commissioner,87 T.C. 970, 978 (1986). Thus, to the extent that D & D claimed a basis in those assets on its returns, there is a valuation overstatement within the meaning of section 6659(c) and, therefore, section 6621(c). Zirker v. Commissioner,87 T.C. at 979-981. We therefore hold that petitioner is liable under section 6621(c) for additions to the tax with respect to the valuation overstatement. With respect to the Chinco transaction, we disallowed petitioner's losses from Chinco on the ground that Chinco's activity did not possess the requisite profit objective. Deductions disallowed because an activity was not entered into for profit are considered to be attributable to tax motivated transactions for purposes of section 6621(c). See sec. 301.6621-2T, A-4(1) and (2), Temp. Proced. & Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984); Patin v. Commissioner,88 T.C. 1086, 1129 (1987). *277 We therefore hold that respondent is entitled to increased interest on the portion of the underpayment attributable to the losses claimed by petitioner which arose out of the disallowed Chinco deductions. With respect to the disallowed ITC from Chinco, respondent has forwarded no authority to support the application of section 6621(c) to ITCs disallowed on account of section 183, and we have found none. [42] Respondent's briefs in fact do not address the applicability of section 6621(c) to ITCs disallowed under any Code section, and we take that as a concession by respondent that the section 6621(c) addition to tax is inapplicable in the instant case to the disallowed ITCs. *278 To reflect the foregoing, Decisions will be entered under Rule 155.
APPENDIX 1 CHINCO PROPERTIES
( A Limited Partnership)
STATEMENT OF PROJECTED CASH FLOW TO BE DISTRIBUTED TO LIMITED PARTNERS
1976
1977
1978
1979
HOMES PASSED (Assumption 1)
2,100
2,100
2,100
2,100
PRIMARY SUBSCRIBERS
Begin
1,635
1,635 1,655
1,675
End
1,635
1,655 1,675
1,695
Average
1,635
1,645 1,665
1,685
Pay Subscribers
-- -- 650
900
Average Basic Rates
$ 5.65
$    6.50
$    6.75
$    7.25
Pay Rate
-- -- $    6.00
$    6.00
CASH IS TO BE PROVIDED BY:
Subsriber Income
$ 9,238
$ 128,310 $ 134,865
$ 146,595
Pay TV Income
-- -- 46,800
64,800
TOTAL CASH PROVIDED
$ 9,238
$ 128,310 $ 181,665
$ 211,395
CASH IS TO BE USED FOR;
Pay TV (Assumption 3)
$   -- $      -- $  23,400
$  32,400
Operating Expenses
5,042
60,500 70,000
70,000
Management Fee (Assumption 2)
462
6,416 9,083
10,570
Note Principal and Interest -
(Assumption 7)
-- 73,000 73,000
80,000
Management Bonus
-- -- -- -- TOTAL CASH USED
$ 5,504
$ 139,916 $ 175,483
$ 192,970
CASH FLOW
$ 3,734
$ (11,606)
$   6,182
$  18,425
CASH TO BE DISTRIBUTED
General Partner (Assumption 4)
$     184
Limited Partners
$  18,241
*279 1980
1981
1982
HOMES PASSED (Assumption 1)
2,100
2,100
2,100
PRIMARY SUBSCRIBERS
Begin
1,695
1,715
1,735
End
1,715
1,735
1,755
Average
1,705
1,725
1,745
Pay Subscribers
1,200
1,250
1,300
Average Basic Rates
$    7.25
$    7.75
$    7.75
Pay Rate
$    6.50
$    6.50
$    6.50
CASH IS TO BE PROVIDED BY:
Subsriber Income
$ 148,335
$ 160,425
$ 162,285
Pay TV Income
93,600
97,500
101,400
TOTAL CASH PROVIDED
$ 241,935
$ 257,925
$ 263,685
CASH IS TO BE USED FOR;
Pay TV (Assumption 3)
$  46,800
$  48,750
$  50,700
Operating Expenses
75,000
75,000
75,000
Management Fee (Assumption 2)
12,097
12,896
13,184
Note Principal and Interest -
(Assumption 7)
80,000
80,000
80,000
Management Bonus
-- 5,279
8,801
TOTAL CASH USED
$ 213,897
$ 221,925
$ 227,685
CASH FLOW
$  28,038
$  36,000
$  36,000
CASH TO BE DISTRIBUTED
General Partner (Assumption 4)
$     280
$     360
$     360
Limited Partners
$  27,758
$  35,640
$  35,640
1983
1984
HOMES PASSED (Assumption 1)
2,100
2,100
PRIMARY SUBSCRIBERS
Begin
1,755
1,775
End
1,775
1,795
Average
1,765
1,785
Pay Subscribers
1,350
1,400
Average Basic Rates
$    8.00
$    8.50
Pay Rate
$    7.00
$    7.00
CASH IS TO BE PROVIDED BY:
Subsriber Income
$ 169,440
$ 182,070
Pay TV Income
113,400
117,600
TOTAL CASH PROVIDED
$ 282,840
$ 299,670
CASH IS TO BE USED FOR;
Pay TV (Assumption 3)
$  56,700
$  58,800
Operating Expenses
80,000
85,000
Management Fee (Assumption 2)
14,142
14,984
Note Principal and Interest -
(Assumption 7)
80,000
80,000
Management Bonus
15,998
24,886
TOTAL CASH USED
$ 246,840
$ 263,670
CASH FLOW
$  36,000
$  36,000
CASH TO BE DISTRIBUTED
General Partner (Assumption 4)
$     360
$     360
Limited Partners
$  35,640
$  35,640
*280 APPENDIX 2 CHINCO PROPERTIES (A Limited Partnership) STATEMENT OF PROJECTED ESTIMATED NET TAXABLE INCOME (LOSS), TAX SAVINGS (TAX COST) ASSUMING A 60% EFFECTIVE TAX RATE, CASH FLOW, INVESTMENT, AND EXCESS OF TAX SAVINGS AND NET CASH FLOW OVER INVESTMENT TO A LIMITED PARTNER ACQUIRING ONE UNIT PROJECTED FOR THE YEARS 1976 - 1984
ESTIMATED
TOTAL
ESTIMATED
TAX SAV-
TAX SAV-
TAXABLE
INGS (TAX
INGS AND
INCOME
COST) AT
ESTIMATED
NET CASH
YEAR
(LOSS)
60%
CASH FLOW
FLOW
INVESTMENT
1976
$ (15,746)
$  9,448 $    --
$  9,448
$  6,000
1977
(31,131)
18,679 --
18,679
14,000
1978
(20,980)
12,588 --
12,588
15,000
1979
(12,115)
7,269 912
8,181
-- 1980
(11,739)
7,043 1,388
8,431
-- 1981
(10,196)
6,118 1,782
7,900
-- 1982
2,154 (1,292)
1,782
490
-- 1983
2,197 (1,318)
1,782
-464
-- 1984
2,219 (1,331)
1,782
451
-- $ (95,337)
$ 57,204 $ 9,428
$ 66,632
$ 35,000
EXCESS OF TAX
SAVINGS AND NET
CASH FLOW OVER
INVESTMENT
YEAR
ANNUAL
CUMULATIVE
1976
$  3,448 $ 3,448
1977
4,679 8,127
1978
(2,412)
5,715
1979
8,181 13,896
1980
8,431 22,327
1981
7,900 30,227
1982
490 30,717
1983
464 31,181
1984
451 31,632
$ 31,632 *281 NOTE: Estimated Taxable Loss for 1976 includes investment tax credit doubled. Footnotes
1. Unless otherwise indicated, all section and Code references are to the Internal Revenue Code as in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Subsec. (d) of sec. 6621 was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1151(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. ↩
2. In evidence are copies of three checks from petitioner to D & D in the total amount of $ 17,864. The difference between that amount and $ 17,500 is unexplained; however, since all documents in evidence, except the checks, indicate the amount of the contribution was $ 17,500 and since petitioner never suggests otherwise, we accept $ 17,500 as the amount of petitioner's capital contributions to D & D. ↩
3. Specifically, some part of the investor's estimated annual taxable income must have subject to a Federal income tax rate of at least 50 percent, and the investor's net worth must have been in excess of $ 150,000, exclusive of residence, home furnishings, and automobiles. ↩
4. The increase in the balance outstanding from 1983 to 1984 is $ 65,526. 6 percent (interest rate per terms of the note) X $ 1,042,098 (projected 1983 balance on the note) = $ 62,526. The $ 3,000 difference between those two amounts is unexplained, but we speculate that it may be attributable to an error in the drafting of the repayment schedule.↩
*. The last payment was due on January 1, 1985. ↩
5. We note that at least two other cases have found that similar two-year equipment warranties were unusual in the CATV industry in 1976. See Finoli v. Commissioner,86 T.C. 697, 711 (1986); Carlson v. Commissioner,T.C. Memo. 1987-306↩. *. The amounts set forth hereunder will be reduced by any pre-payments of the Note. ↩
6. The Joint Venture agreement did not provide for any specific payments to be made to Realtec, but it alluded to payments to which Realtec would be entitled upon a sale or refinancing of the systems. These payments to Realtec would be payable by D & D pursuant to an agreement between D & D and Realtec whereby D & D retained Realtec as a consultant.↩
7. Even though the consulting agreement between D & D and Realtec is not in evidence, a discussion of that agreement in the Memorandum causes us to conclude that upon the sale or refinancing of the systems, Realtec effectively would receive payments only after D & D has received $ 700,000 for itself. ↩
8. Cable Holding Company is not the same corporation as Cable Holdings. The parties do not comment upon the ownership of Cable Holding Company; however, in light of the record before us, it appears that Cable Holding Company is either owned or controlled by Mr. Treibick. ↩
9. The copy of the contract in evidence is typed, except at the part of the contract which reads, "approximately eighteen (18) miles." One the copy in evidence, "(18)" is scratched out and "(14)" is hand written above the scratched out area. Neither petitioner nor respondent has suggested whether the contract was changed from 18 to 14 miles by the parties to the contract; however, since the parties to the contract nowhere indicated their acceptance of the change, by initials or otherwise, we accept 18 miles as being the length of the system for which contracted.↩
10. For the 1977 through 1980 years, we have combined many expenses that were itemized on the returns because those expenses are immaterial to our decision.↩
11. Mr. Treibick's uncontradicted testimony was that approximately 30 percent of the Dania and Davie cable system was underground; a priori, the other 70 percent was attached to utility poles. ↩
12. Petitioner reported his pro rata share of this amount as gain under section 1245. ↩
13. The document referred to the original franchise as having been granted by the "City of Davie, Florida." The ordinance actually came from the Town of Davie. ↩
14. The only mention in the record of Dania Cable TV, Inc. is in this one-sentence document transferring the franchise for Dania, Florida, from that corporation to DVC. This transfer document is virtually identical to the transfer document of the same date for the franchise for Davie, Florida, including the signature of the president of each of the transferor companies, Benjamin Ginsberg. We thus infer that Dania Cable TV, Inc. is owned or controlled by Mr. Treibick. ↩
15. The document referred to the "City of Davie, Florida." See n. 13, supra.↩
16. The exhibit in the Asset Purchase Agreement that listed the number of units within each franchise area contained the following footnote with respect to the Dania, Davie, and Broward County systems: "Some of the homes may be counted in the wrong franchise area because the counts were taken from available strand and construction maps which are somewhat dated as to geographic boundaries." ↩
17. Buford, the successor to the Dania franchise from Mr. Treibick's corporations, apparently still owned the franchise right in 1983. ↩
18. Petitioner has not suggested that he could not obtain a copy from either the City of Dania or the Town of Davie of any ordinance granting permission for a franchise transfer. In fact, we feel that petitioner surely could have obtained a copy of such a public act if any such ordinance ever were enacted by either locality. ↩
19. If the Memorandum was incorrect in regard to whether the franchises could be transferred without municipal approval, a significant question arises in our mind -- why was the partnership ignorant in regard to the transferability of what would be arguably its most important asset? We think that if the promoters of the partnership (petitioner and Mr. Desimone and possibly the general partner Mr. Stein) were truly interested in owning and profiting from the cable systems, rather than interested only in the tax benefits therefrom, they would have assured themselves as to the requirements for transfer of the franchise rights. That D&D might need to convince a municipal council to grant approval before the franchise could be transferred to or by D&D should be a significant consideration in determining the value of the system and the franchise. We do not understand how a potential owner would fail to ascertain what transfer restrictions, if any, were on the asset to be purchased if the owner truly were interested in any more than tax deductions. If in fact there were no transfer restrictions on the franchises (and, except for the statement in the Memorandum, we have seen no indication that there were), the fact that the Memorandum stated that there were such franchise restrictions leads us to believe that the promoters had little or no interest in the potential profits that could be made from the CATV systems. In short, it indicates that the promoters were concerned only with the potential tax benefits of nominally owning the systems. ↩
20. The record contains no evidence concerning the 1976 or 1977 editions. The 1980 edition lists Buford as the owner of the systems and notes that Buford purchased each of the systems from Richard Treibick on February 1, 1980. ↩
21. Although the note repayment schedule provided that only $ 70,520 of interest was due for 1976, D&D prepaid interest in the amount of $ 76,000. The differences among those amounts and the $ 72,143 that was deducted on D & D's 1976 income tax return are unexplained. It appears, however, that Mr. Treibick's corporations apparently did not consider any part of the interest prepayment as applying to 1977. The accrued interest assumed by Davie Cable on the Cable Holdings note equaled simple interest on the original principal amount of $ 1,200,000 for three full years, 1977, 1978, and 1979, at the interest rates for those years provided in the Cable Holdings note. ↩
22. Respondent asserts that the $ 140,000 warranty payment, the $ 20,000 noncompetition fee, and the $ 125,000 payment for start-up costs and finder's fee all should be considered as part of the purchase price. Petitioner, to some extent, apparently accepts respondent's characterization. In his closing statement at trial, petitioner noted: The various fees that were deducted by the partnership, payment for those fees I believe has been established. However, it is obvious from the testimony that fees are a part of an overall purchase price and what has taken place is that the overall purchase price has been broken down into its parts. ↩
23. See Smith v. Commissioner,T.C. Memo. 1985-567, affd. in an unpublished opinion 820 F.2d 1220↩ (4th Cir. 1987). As of 1978, petitioner's tax savings (presuming he was in the 50 percent marginal bracket as mandated by the partnership agreement) would have surpassed his partnership contribution. Petitioner's share of D&D's losses in 1976, 1977, and 1978 total $ 32,488 -- a Federal tax savings of $ 16,244. Including the ITC of $ 3,465 taken by him, petitioner's tax savings from D&D were $ 19,709, or $ 2,209 greater than his cash outlay, within two and a half years of his initial partnership payment. 24. See also Vandenhoff v. Commissioner,T.C. Memo. 1987-116. Although neither party mentions section 709, that provision essentially codifies the holding of Wildman with respect to partnerships. See generally Estate of Thomas v. Commissioner,84 T.C. 412, 442-443 (1985). Section 709 provides: SEC. 709. TREATMENT OF ORGANIZATION AND SYNDICATION FEES. (a) General Rule. -- Except as provided in subsection (b), no deduction shall be allowed under this chapter to the partnership or to any partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership.
Section 709(a) is applicable to partnership taxable years beginning after December 31, 1975, and thus applies to all years at issue herein. Pursuant to section 709(b), partnerships may elect to amortize certain organizational expenses, which would not be deductible otherwise, over a 60-month period. The section 709(b) election is not available for syndication fees. The section 709(b) election is available for amounts paid or incurred in taxable years beginning after December 31, 1976. Pub. L. 94-455, sec. 213(b), 90 Stat. 1547. No section 709(b) election was made by D&D for any of the years at issue. In fact, a section 709(b) election was unavailable for most, if not all, of the payment out of the original capital contributions because those payments appear to have been made or incurred during 1976, before the effective date of section 709(b). ↩
25. The amount deducted was $ 120 in excess of the amount required to be paid to the Joint Venture. That difference is immaterial, in that respondent did not disallow all deductions reported by D&D; only those deductions in excess of reported income were disallowed. We thus need not find that all↩ deductions claimed by D&D are disallowed in order for us to uphold respondent's determinations. 26. In the notices of deficiency and the pleadings, respondent disallowed all of petitioner's claimed losses from D&D; however, respondent made no correlative reduction in the amounts of capital gain, section 1245 gain, and ITC recapture reported by petitioner on his 1980 income tax return. Our disallowance of petitioner's claimed losses and ITC is based on a finding that D&D never owned the CATV systems. Thus, petitioner, as a partner in D&D, is not liable for gains from the disposition of property never owned by D&D and for which D&D got no benefit upon the resale to Buford. Similarly, there is no liability for recapture of ITC never allowed. The parties are instructed to prepare the Rule 155 computation accordingly. ↩
27. Specifically, some part of the investor's estimated annual taxable income must have been subject to a Federal income tax rate of at least 50 percent, and the investor's net worth must have been in excess of $ 150,000, exclusive of residence, home furnishings, and automobiles. ↩
28. The preamble of the note stated that Chinco promised to pay the principal sum on January 11, 1988, together with interest on the unpaid principal. The difference between that date and the January 1 date given in the footnote to the payment schedule is unexplained. ↩
29. All documents in evidence from the municipality are from the Town of Chincoteague. There is no city by the name of "Chincoteague" in Virginia. ↩
30. No definition of "startup period" was set forth in the Joint Venture agreement. ↩
31. Chincoteague is approximately 150 miles from both Baltimore and Washington. ↩
*. The amount of the deduction claimed for management fees for 1979 is not in the record. ↩
32. In its reconciliation of partners' capital accounts, the 1980 partnership return reported that $ 56,532 of the net loss was not allowable as a deduction for 1980, but the return did not elaborate further. Schedule K of the partnership return shows an unidentified amount of $ 57,103. The record contains no other information in regard to those two amounts; however, we note that petitioner's reported loss from Chinco for 1980 is equal to 4.95 percent (his share in Chinco) multiplied by $ 348,318 (total partnership loss of $ 405,421 - $ 57, 103). ↩
33. Section 183 provides as follows:
SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE. -- In the case of any activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). In accord with section 183(b)(2), respondent disallowed petitioner's deductions from Chinco only to the extent of any income reported by the partnership. Petitioner has not suggested that he should be allowed any deductions under section 183(b)(1) if we should find that the requisite profit motive was not present. We take that as a concession by petitioner that if we find that the Chinco activities were not engaged in for profit, he is entitled to deductions from Chinco only to the extent of income reported by Chinco. ↩
34. Respondent's brief suggests that the stated purchase price should include the various fees payable to CACO and its sister corporation, RSC. As noted above in footnote 22, petitioner at least somewhat agrees. If the $ 200,000 warranty fee, the $ 50,000 system analysis fee, the $ 150,000 system transfer fee, and the $ 50,000 noncompetition fee are taken into account, the stated purchase price of Chinco's acquisition of the Chincoteague system would be $ 2.01 million. The addition of the $ 15,000 stated cost of the franchise would result in a total stated purchase price of $ 2,025,000 million for the complete Chincoteague cable system. ↩
35. That statement is attached as Appendix 1 to our opinion. We note also that Mr. Kepper assumed annual revenues of $ 145,000 and annual operating expenses of $ 61,000 from the system. The projections in the Placement Memorandum estimated that operating expenses would range from $ 60,500 to $ 85,000 for the period. The projections in the Placement Memorandum also included expected annual cash outlays of $ 73,000 to $ 80,000 for payment of the CACO note, a particular that apparently was omitted from the information furnished to Mr. Kepper. The projections for the Placement Memorandum were prepared by Lieberman and Shapot, Certified Public Accountants, based on information provided by Chinco's management. ↩
36. The annual cash flow of $ 36,000 was not projected to be reached until 1981, which, according to the projection statement, was the fourth year that pay TV was to have been in service. ↩
37. Petitioner has suggested that principles of present value should be considered in determining the reasonableness of Chinco's purchase price. Petitioner's suggestion apparently is based on the fact that the terms of the CACO note are more favorable than those a disinterested third party lender would require. Mr. Kepper's appraisal includes an attachment which is a one-page letter from Joseph C. Glass that discusses financing for CATV systems. Mr. Glass' letter notes that financing for systems the size of that in Chincoteague "is not readily available from traditional banking sources due to the risks and the costs of originating such a loan. Thus, lenders such as Firstmark Financial are available offering financing with interest rates floating at five to six percentage points over prime * * *." (When Chinco executed the CACO note, on December 31, 1976, the predominant prime rate was 6.25 percent according to the Federal Reserve Bulletin. Munn and Garcia, Encyclopedia of Banking and Finance, p. 779 (8th ed. 1983).) Mr. Glass' letter was submitted as of March 31, 1977, and his opinion was that, because of its low stated interest rate, the CACO note had a fair market value between $ 657,000 and $ 803,000. We agree with Mr. Glass that the fair market value of the CACO note was significantly below formed his opinion using the assumption that the value of the assets of the Chincoteague system approximated the face amount of the CACO note. Mr. Glass' opinion was submitted to be used by Mr. Kepper in the latter's appraisal. We suspect that Mr. Glass would have given an even lower fair market value for the CACO note had he known that the assets securing the note were worth only one third as much as the face value of the note. For that matter, we wonder whether any legitimate third party would have ventured to lend Chinco $ 1.46 million on any nonrecourse terms, since the sum worth of all of Chinco's assets (i.e., the system) did not even approach that principal amount. ↩
38. Chinco's ownership of the cable system is quite distinguishable from the wildcat oil driller contemplated in Senate Report 91-552 (1969), 1969-3 C.B. 490, and section 1.183-2(a), Income Tax Regs. The wildcat driller may not have a high probability of striking oil and making a profit; however, if he does strike oil, the potential profits can be virtually unlimited. Any actual expectation of the value of the Chincoteague system increasing, on the other hand, was muted significantly by the lack of expected population expansion, but, even more so, by the fact that the partnership's purchase price for the system was thrice its value. By purchasing the system at such a highly inflated, artificial price, Chinco was tying both its hands behind its back before attempting to grab what profit might be available from cable television in Chincoteague. It certainly was not a bona fide attempt at profitable cable television ownership. See Fox v. Commissioner,80 T.C. at 1017-1018↩. 39. Mr. Kepper's 1977 appraisal was made for Chinco to use in hearings before the Chincoteague town council for renewal of the franchise. Chinco made no inquiry of Mr. Kepper and no use of his services until well after it already had acquired the Chincoteague system. Also, the Placement Memorandum conspicuously noted that the general partner, Mr. Hodas, had had no experience in any phase of the CATV industry. We are unable to perceive how Mr. Hodas' experience in the hair fashion industry would afford him any knowledge or expertise with respect to the CATV industry; petitioner has not even suggested that Mr. Hodas might have had any such knowledge. ↩
40. In accordance with our findings above, most of which were based on the documents to which both parties stipulated as evidence, we would disallow the losses and ITC from Chinco for the years at issue regardless of which party had the burden of proof. Also, on account of our holding on the Chinco issue, we need not consider the other argument raised by respondent. ↩
41. Section 6621(c)(3)(A)(v) was added by Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750, and applies to interest accruing after December 31, 1984. ↩
42. Although respondent correctly asserted that the Chinco transaction involved a valuation overstatement, that overstatement did not cause any additional ITC from Chinco to be taken. Although Chinco claimed a basis in the system of $ 1.56 million, it only passed through ITC on a cost basis of $ 100,000 to its partners because the equipment was used and therefore subject to the limitations of section 48(c)(2). Thus, the ITC taken in 1976 was taken only on a cost basis of $ 100,000 of property. We found that the system's value was $ 565,000, so the 1976 ITC was not attributable to any overstatement; the Chinco partners would have taken the same amount of ITC if the system had been valued properly. With respect to the 1980 ITC from Chinco, respondent has forwarded no evidence whatsoever to indicate that the ITC was attributable to a valuation overstatement, and, because he has the burden of proof for the 1980 addition to tax, we deem him to have conceded that the 1980 ITC was not attributable to a valuation overstatement. Rule 142(a). ↩